| | | |
|---|---|---|
| **Jeff Faulkner, James Martin,** | § | |
| **Marvin "Bill" McCall, Andrew McNulty,** | § | |
| **Ricky Morris, Keith Roberts, Carl Hillburn,** | § | |
| **Brian Smith, Pedro "Pete" Rivas, C.R.** | § | |
| **House, Alejandro Gonzalez, Logan** | § | |
| **Thompson, Bart Nicholas, Robert Moss,** | § | |
| **Johnny McKinney, Roy W. Westbrook,** | § | |
| **Larry Wood, Kenneth Beam, Jeremy** | § | |
| **Umphries, and Carlos Guadarrama** | § | |
| **Plaintiffs** | § | |
| | § | |
| **vs.** | § | **Civil Action No.** |
| | § | **6-12-cv-00104-LED** |
| | § | |
| **Patterson-UTI Drilling Company, LLC** | § | |
| **Defendant** | § | |

### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGEMENT AS TO EMPLOYEE STATUS AND LIQUIDATED DAMAGES

NOW COME plaintiffs Jeff Faulkner, James Martin, Marvin "Bill" McCall, Andrew McNulty, Ricky Morris, Keith Roberts, Carl Hillburn, Brian Smith, Pedro "Pete" Rivas, C.R. House, Alejandro Gonzalez, Logan Thompson, Bart Nicholas, Robert Moss, Johnny McKinney, Roy W. Westbrook, Larry Wood, Kenneth Beam, Jeremy Umphries, and Carlos Guadarrama, (hereinafter collectively referred to as "plaintiffs") and file this Motion for Partial Summary Judgment as to Employee Status and Liquidated Damages, against Defendant Patterson-UTI Drilling Co., LLC (hereinafter "Patterson" or "defendant") and respectfully state as follows:

# I.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This lawsuit arises under the Fair Labor Standards Act (FLSA) and concerns the defendant's practice of misclassifying welders as independent contractors to avoid meeting the FLSA's overtime pay requirements. The plaintiffs have brought these lawsuits seeking to recover their overtime wages that were wrongfully withheld.

Both parties acknowledge that the plaintiffs did work for the defendant; worked more than 40 hours a week; were not paid overtime; and that the FLSA requires companies to pay their non-exempt employees time-and-a-half overtime. Plaintiffs' Original Complaint (Document 1) ¶¶14-17; Defendant's Original Answer (Document 6) ¶¶ 14-17 and 25. The disputed question, then, is whether the plaintiffs were employees or independent contractors as defined by the FLSA. The plaintiffs now move for Summary Judgment seeking a judicial determination that, as a matter of law, they (1) were employees of the defendant as defined by the standards of the FLSA and (2) the defendant cannot meet its burden of showing that it acted in "good faith" in failing to pay overtime.

This Motion for Summary Judgment should be granted for the following reasons:

# II.
## ISSUES TO BE DECIDED AND BURDEN OF PROOF

The primary issue to be decided is whether the plaintiffs were "independent contractors" or "employees" under the meaning of the FLSA. The plaintiffs have the burden of proof in proving they are employees. If the court finds the plaintiffs to be employees, a further issue to be decided is whether the plaintiffs are entitled to liquidated damages. The defendant has the

burden of proving good faith to avoid paying liquidated damages. *Stokes v. BWXT Pantex, L.L.C.,* 424 F. App'x 324, 326 (5th Cir. 2011).

According to the *Federal Rules of Civil Procedure*, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. *56.* The Fifth Circuit has established that, for cases such as the one under consideration, "the ultimate finding as to employee status is not simply a factual inference drawn from historical facts, but more accurately is a *legal conclusion* based on factual inferences drawn from historical facts." *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1045 (5th Cir. 1987) (Emphasis added). Thus, in this case, where there is no serious dispute over material facts, a finding of employee status is primarily a legal conclusion and, therefore, an appropriate subject for summary judgment.

### III.
### <u>SUMMARY JUDGMENT EVIDENCE</u>

Plaintiffs incorporate by reference the following summary judgment evidence in which each number refers to an attached exhibit.

1. Excerpts from the deposition of Kenneth Beam which are attached as Exhibit 1 and incorporated herein by reference as if set forth at length.

2. Excerpts from the deposition of Jeff Faulkner which are attached as Exhibit 2 and incorporated herein by reference as if set forth at length.

3. Excerpts from the deposition of James S. Feistel which are attached as Exhibit 3 and incorporated herein by reference as if set forth at length.

4. Excerpts from the deposition of Alejandro Gonzalez which are attached as Exhibit 4 and incorporated herein by reference as if set forth at length.

5. Excerpts from the deposition of Carlos J. Guadarrama which are attached as Exhibit 5 and incorporated herein by reference as if set forth at length.

6. Excerpts from the deposition of Mike Hasler which are attached as Exhibit 6 and incorporated herein by reference as if set forth at length.

7.      Excerpts from the deposition of Carl Hilburn which are attached as Exhibit 16 and incorporated herein by reference as if set forth at length.

8.      Excerpts from the deposition of C.R. House which are attached as Exhibit 8 and incorporated herein by reference as if set forth at length.

9.      Excerpts from the deposition of Brandon Martin which are attached as Exhibit 9 and incorporated herein by reference as if set forth at length.

10.     Excerpts from the deposition of James "Chad" Martin which are attached as Exhibit 10 and incorporated herein by reference as if set forth at length.

11.     Excerpts from the deposition of Marvin "Billy" McCall which are attached as Exhibit 11 and incorporated herein by reference as if set forth at length.

12.     Excerpts from the deposition of Johnny McKinney which are attached as Exhibit 12 and incorporated herein by reference as if set forth at length.

13.     Excerpts from the deposition of Andrew McNulty which are attached as Exhibit 13 and incorporated herein by reference as if set forth at length.

14.     Excerpts from the deposition of Ricky L. Morris which are attached as Exhibit 14 and incorporated herein by reference as if set forth at length.

15.     Excerpts from the deposition of Robert Moss which are attached as Exhibit 15 and incorporated herein by reference as if set forth at length.

16.     Excerpts from the deposition of Bart Nicholas which are attached as Exhibit 16 and incorporated herein by reference as if set forth at length.

17.     Excerpts from the deposition of Pedro "Pete" Rivas which are attached as Exhibit 17and incorporated herein by reference as if set forth at length.

18.     Excerpts from the deposition of Keith Roberts which are attached as Exhibit 18 and incorporated herein by reference as if set forth at length.

19.     Excerpts from the deposition of James Brian Smith which are attached as Exhibit 19 and incorporated herein by reference as if set forth at length.

20.     Excerpts from the deposition of Logan Thompson which are attached as Exhibit 20 and incorporated herein by reference as if set forth at length.

21.     Excerpts from the deposition of Jeremy Umphries which are attached as Exhibit 21 and incorporated herein by reference as if set forth at length.

22.     Excerpts from the deposition of Roy W. Westbrook which are attached as Exhibit 22 and incorporated herein by reference as if set forth at length.

23.     Excerpts from the deposition of Larry Wood which are attached as Exhibit 23 and incorporated herein by reference as if set forth at length.

24.     Excerpts from the deposition of Melvin Hall which are attached as Exhibit 24 and incorporated herein by reference as if set forth at length.

25.     Excerpts from the deposition of Mike Reimers which are attached as Exhibit 25 and incorporated herein by reference as if set forth at length.

26.     Excerpts from the deposition of Tommy Spurlock which are attached as Exhibit 26 and incorporated herein by reference as if set forth at length.

27.     Excerpts from the deposition of Byron Walther which are attached as Exhibit 27 and incorporated herein by reference as if set forth at length.

28.     Affidavit of Richard Andel which is attached as Exhibit 1and incorporated herein by reference as if set forth at length.

29.     Affidavit of Jimmy Flukinger which is attached as Exhibit 29 and incorporated herein by reference as if set forth at length.

30.     Affidavit of Jerry Krogsgaard which is attached as Exhibit 30 and incorporated herein by reference as if set forth at length.

31.     Affidavit of Delbert Lawrence which is attached as Exhibit 31 and incorporated herein by reference as if set forth at length.

32.     Excerpts from the deposition of Plaintiff Richard Andel which are attached as Exhibit 32 and incorporated herein by reference as if set forth at length.

33.     Excerpts from the deposition of Plaintiff Jimmy Flukinger which are attached as Exhibit 33 and incorporated herein by reference as if set forth at length.

34.     Excerpts from the deposition of Plaintiff Jerry Krogsgaard which are attached as Exhibit 34 and incorporated herein by reference as if set forth at length.

35.     Excerpts from the deposition of Plaintiff Delbert Lawrence which are attached as Exhibit 35 and incorporated herein by reference as if set forth at length.

36.     Invoices of J. Carlos Guadarrama as produced by Defendant bate stamped PAT-FAULKNER-000208 through PAT-FAULKNER-000290 which are attached as Exhibit 36 and incorporated herein by reference as if set forth at length.

37.     Invoices of Larry Wood as produced by Defendant PAT-FAULKNER-001139 through PAT-FAULKNER-001201 which are attached as Exhibit 37 and incorporated herein by reference as if set forth at length.

38.     Invoices of Marvin "Billy" McCall as produced by Defendant PAT-FAULKNER-000400 through PAT-FAULKNER-000419 which are attached as Exhibit 38 and incorporated herein by reference as if set forth at length.

## STATEMENT OF AGREED FACTS

The Plaintiffs worked as welders in the Defendant's yards in Tyler and Victoria, Texas. The Plaintiffs were paid on an hourly basis. The Plaintiffs typically worked for Patterson more than 40 hours per week. The Plaintiffs were not paid time and a half for hours worked in excess of 40 hours per week

## ISSUES TO BE DETERMINED

1.      Whether the Plaintiffs were employees of Patterson as defined by the FLSA.

2.      Whether the Defendant acted in good faith in classifying Plaintiffs as independent contractor so that Plaintiffs are entitled to liquidated damages.

## IV.
## BACKGROUND

Congress intended the FLSA to be "an attack on recognized evils in our national economy" and, thus, with that aim in view, to "eliminate low wages and long hours" and to "free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers." *United States v. Silk,* 331 U.S. 704, 712, (1947); *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 727, (1947).

Because of these broad remedial intentions, the FLSA has one of the more expansive definitions of "employee" in the legislative record. *See Mr. W Fireworks,* 814 F.2d at 1043. Section 203 of the FLSA defines an "employee" as "someone employed by an employer" and "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." *See* 29 US.C. § 203(d).  "Employ" means simply "to suffer or permit to work." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318 (1992), *quoting* 29 US.C. § 203(g).  This definition is so broad and inclusive that courts generally are "not limited by any contractual

terminology used by the parties or by the traditional common law concepts of 'employee' or

'independent contractor.'" *Dole v. Snell,* 875 F.2d 802, 804 (10th Cir. 1989)*, citing McLaughlin

v. Seafood, Inc.,* 861 F.2d 450, 452 (5th Cir.1988), *modified,* 867 F.2d 875 (1989); *Donovan v.

Williams Oil Co.,* 717 F.2d 503, 505 (10th Cir. 1983).

       In determining whether a worker is an employee, courts evaluate whether or not the

alleged employee is economically dependent upon the alleged employer during the time she is

working for them. *Bartels v. Birmingham,* 332 U.S. 126, 130 (1947). ("In the application of

social legislation [i.e. the FLSA], employees are those who as a matter of economic reality are

*dependent* upon the business to which they render service.")

       In making a determination of economic dependence (and, therefore, employee status), the

courts have generally considered a five-factor "economic realities" test. *Silk,* 331 U.S. at 716.

The factors are: (1) The degree of control exercised by the alleged employer; (2) The degree to

which the "employee's" opportunity for profit and loss is determined by the "employer;" (3) The

extent of the relative investments of the putative employee and employer; (4) The skill and

initiative required in performing the job; and (5) the permanency of the relationship. *Mr. W

Fireworks,* 814 F.2d at 1043; *also see, e.g., Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308,

1311 (5th Cir.), *cert. denied,* 429 U.S. 826 (1976); *Robicheaux v. Radcliff Material, Inc.,* 697

F.2d 662, 666 (5th Cir. 1983). Many courts have also looked at a sixth factor: "the extent to

which the work is an integral part of the alleged employer's business." *See Snell,* 875 F.2d *at*

805. *Also see, e.g., Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2nd Cir. 1988); *Sec'y of

Labor, U.S. Dep't of Labor v. Lauritzen,* 835 F.2d 1529, 1535 (7th Cir. 1987).

       No single factor can, by itself, conclusively establish employee or independent contractor

status. Rather, courts must look at whether or not the totality of factors points to an overriding

determination of economic dependence. *Birmingham,* 332 U.S. at 1549. *Also see McComb,* 331 U.S. at 730.

## V.
## ARGUMENTS AND AUTHORITIES

**A.  FLSA's definition of employee is one of the broadest found in U.S. legislative history**

Because of the remedial purposes of the FLSA, "courts must not be overly cautious or tentative in reaching [a determination of economic dependence], for Congress intended the Act's prescriptive scope to be expansive." *Mr. W Fireworks,* 814 F.2d at 1043.  In other words, "the FLSA is designed to *defeat* rather than implement contractual arrangements." *Lauritzen,* 835 F.2d at 1544-1545 (Emphasis added).  It is, by intention, *extremely* broad.

**B.  A finding that the welders were employees is in line with the purpose of the act**

One of the primary purposes of the FLSA overtime pay requirement is "to spread employment by placing financial pressure on the employer to hire additional workers rather than employ the same number of workers for longer hours." *Donovan v. Brown Equip. & Serv. Tools, Inc.,* 666 F.2d 148, 152 (5th Cir. 1982).  It would be surprising if Congress intended to allow companies to sidestep this "financial pressure" by classifying workers as independent contractors while at the same time requiring said workers to work overtime. *Ex. 27. Depo. of Walther at* 130:21-24.

Byron Walther testified explicitly that—were it not for Patterson's practice of requiring its welders to work over forty hours a week with no premium—Patterson likely would have needed to hire more welders:

> **Q:**  And you had situations where people would come up and ask to be hired, and you would say, no, we don't have any space available for you right now.  We can't use you?
> **A:**  There wasn't no openings.
> …

**Q.** No openings. And at the time you were telling these people no openings, you would have had welders that were currently working for you that were working more than 40 hours a week?

**A.** Yes.

…

**Q.** If you needed a certain number of welder hours and you only worked them 40 hours a week, you would need more welders?

**A.** Yes.

*Ex. 27. Depo. of Walther at* 131:2-22. There is an example of this situation occurring in the deposition of at least one of the welders. Ricky Morris testified that, before he eventually came to work for Patterson, he "called [a Patterson worker] and told him [he] needed a job. [The worker] talked to Raymond [Bonds]" and "Raymond said he didn't need nobody right then." *Ex. 14. Depo. of Morris at* 24:2-4. If Patterson were not then requiring its welders to work over forty hours a week with no overtime pay, it would have had a strong financial incentive to hire Ricky Morris immediately and, thus, reduce unemployment.

This argument is important, because—although the "economic realities" test is helpful in making a determination of economic dependence or independence—the Fifth Circuit has noted that "[t]he ultimate criteria are to be found in the *purposes* of the act." *Fahs v. Tree-Gold Co-op Growers of Florida,* 166 F.2d 40, 44 (5th Cir. 1948) (Emphasis added).

**C. Consideration of the five-point "economic realities" test demonstrates that the plaintiffs were employees.**

i.     *The defendant exercised complete control over the plaintiffs in all matters of importance, including controlling when, where, and how the plaintiffs' work was to be done.*

The defendant exercised extensive control over the plaintiffs in all matters of importance. Courts have generally found control over a plaintiff by a defendant to weigh heavily in favor of employee status in FLSA miscategorization cases. *See, e.g., Mr. W Fireworks,* 814 F.2d at1048-49; *Pilgrim Equip.,* 527 F.2d at 1311-12; *Radcliff Material,* 697 F.2d at 666. When they first

started working for Patterson, some of the welders had to go through an application process. *See, e.g., Ex. 19. Depo. of Smith at* 28:19 – 29:21 (Knew someone in Human Resources and sent in a resume to Melvin Hall), 30:10-15 (Signed something saying he had read a one-page employee sheet); *Ex. 20. Depo. of Thompson at* 14:10 – 16:1 (Turned in an application). The plaintiffs were required to arrive before 7:00 a.m. *See, e.g., Ex. 14. Depo. of Morris at* 25:7-11. *Also see, e.g., Ex. 32. Depo. of Andel at* 167:2-13; *Ex. 33. Depo. of Flukinger at* 63:9-20. One welder testified that a supervisor threatened to fire them if they were "anywhere from a minute to 10 minutes late." *Ex. 34. Depo. of Krogsgaard at* 137:18 – 138:3. In the beginning, in the Tyler yard, the welders were required to sign in physically on a sign-in sheet. *Ex. 3. Depo. of Feistal at* 89:4-23. Later, Patterson assigned them truck numbers to affix to their windshields, and Patterson would check them off as they drove in and out of the yard. *See id.*[1] Similarly, in the Victoria yard, the welders were required to sign in on a sign-in sheet. *Ex. 17. Depo. of Rivas at* 26:20 – 27:8. For welders who were accustomed to some degree of independence while working for other businesses, being required to sign in was frustrating, because "when you work for yourself, you work your own hours." *Ex. 3. Depo. of Feistal at* 90:18-23. In Victoria, and occasionally in Tyler, as soon as they arrived, they were required to sign in and attend a safety meeting. *Ex. 17. Depo. of Rivas at* 30:21-24. *See also, e.g., Ex. 35. Depo. of Lawrence at* 150:3-8.[2] A Patterson supervisor then assigned them to various jobs and sometimes even required them to go work in remote fields. *See, e.g., Ex. 17. Depo. of Rivas at* 55:1-11; *Ex. 32. Depo. of Andel at* 104:13-19.

---

[1] Several welders corroborate this testimony. *See, e.g., Ex. 5 Depo. of Guadarrama at* 53:10 – 55:21; *Ex. 7 Depo. of Hilburn at* 71:12 – 72:25; *Ex. 8. Depo. of House at* 86:5-15; *Ex. 18 Depo. of Roberts at* 78:14-18; *Ex. 19. Depo. of Smith at* 98:19 – 99:9; *Ex. 22. Depo. of Westbrook at* 167:23 – 168:3; *Ex. 10. Depo. of J. Martin at* 65:13-25.
[2] *See also Ex. 6. Depo. of Hasler at* 82:18-22; *Ex. 23. Depo. of Wood at* 37:16-20; *Ex. 5. Depo. of Guadarrama at* 91:1-7; *Ex. 9. Depo. of B. Martin at* 49:1-7.

The defendant strictly controlled the plaintiffs' activities. The plaintiffs were not usually allowed to approach the office. *Ex. 33. Depo. of Flukinger at* 108:18-22. They had to weld however their Patterson supervisor told them to weld, usually following a picture or a drawing. *See, e.g. Ex. 3. Depo. of Feistal at* 112:12-20 ("I was told exactly what to do… Sometimes there would be blueprints"); *Ex. 9. Depo. of B. Martin at* 87:11-17; *Ex. 32. Depo. of Andel at* 91:1-10.[3] The drawings were specific enough that welders often had to ask for clarifications, although if they asked *too* many times, they would be verbally reprimanded. *Ex. 32. Depo. of Andel at* 183:25 – 184:6. A Patterson supervisor sometimes told the plaintiffs what kind of welding rod to use. *See, e.g., id. at* 92:2-17. ("If you were welding on a derrick, you have to have a special welding rod."). A supervisor would require them to use certain equipment for certain jobs, and one welder testified that he was required to borrow a piece of equipment that he did not have: "If I didn't have a… track torch, [Patterson supervisor, Byron Walther,] would tell me to go borrow one to cut rip plate… because it was faster for him." Ex. *34. Depo.of Jerry Krogsgaard at* 147:6-10. The welders were not allowed to use cell phones, except for Patterson business purposes, in an emergency, or during a break. *Ex. 24. Depo. of Hall at* 87:17-25.[4] When it was hot, welders were not allowed to drink energy drinks, but they were required to drink a certain amount of water per hour. *Ex. 14. Depo. of Morris at* 53:6-10. In the Tyler yard, Patterson literally locked the gates during work hours so that the welders could not leave without first

---

[3] *See also Ex. 3. Depo. of Feistal at* 126:12-25, 127:17 – 128:6; *Ex. 4. Depo. of Gonzalez at* 25:6-10; *Ex. 5 Depo. of Guadarrama at* 69:6-13; *Ex. 6. Depo. of Hasler at* 37:15-23; *Ex. 8. Depo. of House at* 89:8-21, 105:8-9; *Ex. 1. Depo. of Beam at* 38:11-15, 50:17-21, 51:6-23; *Ex. 17. Depo. of Rivas at* 70:14 – 71:15, 126:16-17; *Ex. 18. Depo. of Roberts at* 31:9 – 32:2, 44:15-25, 46:5-8; *Ex. 19. Depo. of Smith at* 45:1-8, 45:21 – 47:6, 137:2-4; *Ex. 20. Depo. of Thompson at* 55:1-6, 23:5-16 (Testifying they told him how long jobs should take); *Ex. 21. Depo. of Umphries at* 37:17 – 38:5; *Ex. 22. Depo. of Westbrook at* 96:6-10, 129:24 – 130:3; *Ex. 23. Depo. of Wood at* 33:21 – 34:9, 39:5 – 40:17; *Ex. 10. Depo. of J. Martin at* 59:1-16, 65:2-9; *Ex. 11. Depo. of McCall at* 35:24 – 36:7, 46:1-9; *Ex. 12. Depo. of McKinney at* 46:22 – 47:7, 65:8-24; *Ex. 13. Depo. of McNulty at* 34:25 – 35:3; *Ex. 15. Depo. of Moss at* 32:1-16; *Ex. 16. Depo. of Nicholas at* 29:18 – 30:3.
[4] See also *Ex. 5. Depo. of Guadarrama at* 66:10-22; *Ex. 10. Depo. of J. Martin at* 110:12-17; *Ex. 23. Depo. of Wood at* 73:23-25.

seeking permission. *Ex. 3. Depo. of Feistel at* 81:24-25.[5]   One welder testified that he once

needed to leave early because his daughter was injured, but a Patterson security guard did not

open the gate until the welder explained the details of his "family emergency." *Ex. 5. Depo. of*

*Guadarrama at* 87:8-23.  Some welders were required to bring a doctor's note after being sick.

*Ex. 2. Depo. of Faulkner at* 43:11-22; *Ex.16. Depo. of Hilburn at* 36:5-15.  Patterson paid for and

enforced mandatory, random drug testing for all of its workers, including the welders.  *Ex. 3*

*Depo of Feistal at* 106:4-24 (Testifying that Patterson's HR department drug tested the welders

in Patterson's HR office).[6] Some of the welders testified that Patterson gave them an employee

booklet.  *Ex. 23. Depo. of Wood at* 31:22 – 32:16.  (Testifying that "[t]hey gave out… little

yellow books").[7]  Some welders also testified that Patterson gave them a short safety orientation

when they first started working.[8]  Finally, Patterson told them exactly how to fill out their

invoices.[9]

Patterson also controlled the hours and days the welders worked as well as their rates of

pay.  Patterson would have supervisors set the welders' schedules.  *Ex. 24. Depo. of Hall at* 57:1

– 2.[10]  The welders were told when to take two 15 minute breaks and one 30 minute lunch break.

---

[5] Many welders corroborate this testimony about the gate being kept closed.  *Ex. 2. Depo. of Faulkner at* 54:17 – 55:10; *Ex. 21. Depo. of Umphries at* 80:8-15, 82:9-25, 83:5-10; *Ex. 22. Depo. of Westbrook at* 109:11-19, 127:25 – 128:14; *Ex. 3. Depo. of Feistal at* 102:2-10, 103:9-24; *Ex. 7 Depo. of Hilburn at* 72:1-9; *Ex. 12. Depo. of McKinney at* 49:9-21; *Ex. 10 Depo. of J. Martin at* 36:10-14; *Ex. 16 Depo. of Nicholas at* 23:2-8.

[6] *See also Ex. 3 Depo of Feistal at* 106:4-24; *Ex. 8. Depo. of House at* 89:22 – 90:6; *Ex. 17. Depo. of Rivas at* 137:1-10; *Ex. 19. Depo. of Smith at* 97:18 – 98:3; *Ex. 21. Depo. of Umphries at* 118:1-23; *Ex. 10 Depo. of J. Martin at* 80:7 – 81:14.

[7] *See also Ex. 1. Depo. of Bean at* 32:7-22; *Ex. 6. Depo. of Hasler at* 30:5-9; *Ex. 18. Depo. of Roberts at* 29:12-23; *Ex. 9. Depo. of B. Martin at* 54:17-19; *Ex. 16. Depo. of Nicholas at* 21:18-24.

[8] *Ex. 1. Depo. of Bean at* 33:14-25, 34:14-22;  *Ex. 6. Depo. of Hasler at* 29:21-30:17;  *Ex. 17. Depo. of Rivas at* 30:9-24;  *Ex. 19. Depo. of Smith at* 30:16-25;  *Ex. 20. Depo. of Thompson at* 17:9-25.

[9] *Ex. 2. Depo. of Faulkner at* 46:22 – 49:1; *Ex. 3. Depo. of Feistal at* 118:17-22; *Ex. 4. Depo. of Gonzalez* at 68:5-12; *Ex. 17. Depo. of Rivas at* 145:18-25; *Ex. 19. Depo. of Smith at* 141:3-14; *Ex. 23. Depo. of Wood at* 43:6-13.

[10] *See also Ex. 3. Depo. of Feistel at*  91:3-10, 152:19-24;  *Ex. 4. Depo. of Gonzalez at* 29:4-6, 31:25-32:6, 33:7-16, 34:17-20;  *Ex. 5. Depo. of Guadarrama at* 56:21-57:5, 81:23-82:8;  *Ex. 6. Depo. of Hasler at* 77:29-78:2; 122:17-123:19;  *Ex. 8. Depo. of House at* 77:25 – 78:24; 82– 83:12;  *Ex. 17. Depo. of Rivas at* 25:13 – 26:9 (Would get laid off if he tried to work fewer hours), 3:7-24, 106:1 – 107:13, 107:24 – 108:7 ("You don't decide [how many days you work].  You just go and work until they tell you different things."), 127:11-19, 129:8 – 130:8;  *Ex. 18. Depo. of Roberts at* 70:15-19, 71:8 – 72:24, 76:17-21;  *Ex. 19. Depo. of Smith at* 30:25 – 31:1, 42:24 – 43:12, 97:9-17, 98:15-

*See, e.g., Ex. 24. Depo. of Hall at* 52:1 – 23. One welder testified that, even during lunch, he would discuss work with his supervisors. *Ex. 22. Depo. of Westbrook at* 192:18-21. A supervisor would confront the welders if their breaks lasted five to ten minutes too long. *Ex. 24. Depo. of Hall at 53:3-*6. They could not leave early or take time off without telling a supervisor in advance. *See, e.g., Ex. 4. Depo. of Gonzalez at* 38:15-24.[11] If a welder needed to take a sick day or a personal day, he was required to call. *Ex. 34. Depo. of Krogsgaard* at 113:9 – 114:2. Sometimes, when there was a lot of work, they were not allowed to take a day off at all. *Ex. 32. Depo. of Andel at* 200:13-16. ("Byron might come by and say, 'We need to finish this job, and you can't take no days off until' – I mean, 'We've got to finish this job and get it out; so we have to work.'"). When it was raining, the welders had to wait for a Patterson supervisor to call a rain out before they could leave. *See, e.g., Ex. 9. Depo. of B. Martin at* 98:22-24. *Ex. 33. Depo. of Flukinger at* 61:3-12. ("Independent contractors get to leave and go home, if it's raining.").[12] One welder testified that Melvin Hall sometimes made them work in the rain. *Ex. 9 Depo. of B. Martin at* 98:22 – 99:11. Richard Andel, testified that he asked to work only three days a week

---

22, 140:2-24; *Ex. 20. Depo. of Thompson* 42:9 – 43:22, 48:2-14, 51:2-5; *Ex. 21. Depo. of Umphries at* 106:14-2 (Got an extra hour for rolling up and rolling out); 108:23 – 109:15 (Was made to work an 18 hour day), 32:25 – 33:7, 75:19 – 77:1, 79:2-9; *Ex. 22,. Depo. of Westbrook at* 84:22 – 85:2, 93:7-14, 93:21-25, 95:15-24, 115:13 – 116:23, 117:1 – 119:15, 165:5-16, 172:8-18 (Contrasts Patterson with Scandrill, where they could show up and take their breaks when they wanted to); *Ex. 23. Depo. of Wood at* 46:16 – 47:24; *Ex. 1. Depo. of Beam at* 53:1-13, 57:3-13-58:8, 61-62:19; *Ex. 2. Depo. of Faulkner at* 58:1-11; *Ex. 7. Depo. of Hilburn at* 37:18-38:3; *Ex. 9. Depo. of B. Martin at* 47:3-19; *Ex. 10. Depo. of J. Martin at* 73:6-12 (Horn would blow to signal when break time started and was over), 74:13-75:17; *Ex. 15. Depo. of Moss at* 37:6-19, 38:24-39:17, 40:13-23; *Ex. 16. Depo. of Nicholas at* 74:8-12, 94:17-95:14.

[11] This is corroborated with regard to leaving early. *Ex. 14. Depo. of Morris at* 52:18-25; *Ex. 15 Depo. of Moss at* 36:13-20; *Ex. 16 Depo. of Nicholas at* 59:8-14; *Ex. 32 Depo. of Andel at* 148:6. This is also corroborated with regard to asking for time off or calling in sick. *Ex. 4. Depo. of Gonzalez at* 28:2-14; *Ex. 17. Depo. of Rivas at* 61:18 – 62:6, 64:2-6; *Ex. 19. Depo. of Smith at* 88:16 – 89:1; *Ex. 20 Depo. of Thompson at* 40:19 – 41:4; *Ex. 21. Depo. of Umphries at* 73:20 – 74:11; *Ex. 23 Depo. of Wood at* 54:23-25; *Ex. 14. Depo. of Morris at* 50:15 – 51:17, 52:6-17; *Ex. 15 Depo. of Moss at* 35:16-19; *Ex. 16 Depo. of Nicholas at* 56:12-14.

[12] Many of the welders discuss rainouts in their testimony. *Ex. 3. Depo. of Feistal at* 151:10-20; *Ex. 4. Depo. of Gonzalez at* 37:1-18; *Ex. 5 Depo. of Guadarrama at* 91:25 – 92:13; *Ex. 6. Depo. of Hasler at* 85:4-19; *Ex. 8. Depo. of House at* 90:14-20; *Ex. 17. Depo. of Rivas at* 132:7; *Ex. 18 Depo. of Roberts at* 74:18 – 75:1; *Ex. 21. Depo. of Umphries at* 119:13-24, 88:3-23; *Ex. 23 Depo. of Wood at* 56:11-22, 76:13-17; *Ex. 10 Depo. of J. Martin at* 127:14 – 128:1; *Ex. 11 Depo. of McCall at* 52:1 – 53:11; *Ex. 12. Depo. of McKinney at* 62:3-5; *Ex. 14. Depo. of Morris at* 54:4-11; *Ex. 15 Depo. of Moss at* 42:6-22; *Ex. 16 Depo. of Nicholas at* 60:21 – 61:16.

due to back problems, but Byron Walther turned down his request because the other welders "would be complaining about it" and would "want some more time off." *Ex. 32. Depo. of Andel at* 178:17 – 179:3. Plaintiffs were required to work on weekends and holidays, if they were on the schedule, and some welders were otherwise told that they could not take a day off. *Ex. 24. Depo. of Hall at 57:3-8. See also Ex. 9. Depo. of B. Martin at* 79:22 – 80:14 (Testifying that Melvin said, "If you're scheduled to work here on this Thanksgiving and you're not here, you won't have a job."); *Ex.5 Depo. of Guadarrama at* 98:3 – 100:25 (Testifying he was laid off from Patterson in part because he did not work on Thanksgiving); *Ex. 14. Depo. of Morris at* 55:15-18. ("You were required to work on weekends.")[13] A Patterson supervisor once made a group of welders stay as late as midnight. *Ex. 33. Depo. of Flukinger at* 157:12-16. ("And [Patterson Supervisor Dwayne Carroll] went to chewing on the welders, making the welders stay till midnight and till the trucks are loaded. 'You ain't leaving until that's loaded.' That's what we had to put up with.")

Patterson also set initial pay rates and refused to negotiate them. *Ex. 24. Depo. of Hall at* 78:7-15. Patterson likewise reserved the sole authority to change the welders' hourly rates. *Ex. 33. Depo. of Flukinger at* 31:10-18. All of the welders were paid the same rate, regardless of skill level, unless they were designated by Patterson as supervisors. *Ex. 24. Depo. of Hall at* 47:23-48:4. Similarly, Patterson paid the welders the same rate whether they worked quickly or slowly, well or poorly. *Ex. 24. Depo. of Hall at* 47:11-20. Finally they were paid the same amount no matter what tools or equipment they had. *Ex. 24. Depo of Hall at* 47:11-24

---

[13] *See also Ex. 2. Depo. of Faulkner at 46:3-6; Ex. 5 Depo. of Guadarrama at 93:13 – 9:19; Ex. 8. Depo. of House at 94:4-7; Ex. 19. Depo. of Smith at 89:8-25; Ex. 22. Depo. of Westbrook 147:17-23; 148:14-18; Ex. 23 Depo. of Wood at 55:5; Ex. 1 Depo. of Beam at 91:11-19, 95:7 – 96:9; Ex. 3. Depo. of Feistal at 84:1-10; Ex. 10 Depo. of J. Martin at 84:12-16; Ex. 12. Depo. of McKinney at 53:7-12; Ex. 14. Depo. of Morris at 55:33-56:9; Ex. 15 Depo. of Moss at 36:21 – 37:4, 43:2-8.*

(Testifying that all of the welders, aside from the supervisors, got paid the same amount per hour).

Patterson's degree of control occasionally varied from welder to welder. Some welders testified that they were given specific instructions on how to weld. *See, e.g., Ex. 9. Depo. of B. Martin,* 87:11-17 ("They actually came out there and showed me, 'This is what I got, this is what I need to be done, and this is how I want you to do it'"). *See also Ex. 19. Depo. of Smith, 45:4-8.* ("Melvin would come out and stand up here on [a mud tank] and say you need to do this, you need to do that, take this off, turn it around, just whatever Melvin thought needed to be done to it.")

While other welders testified that a Patterson supervisor did not always stand over them and tell them how to weld, the absence of constant direct supervision is not the kind of "independence" that is relevant in determining whether or not a worker is an employee. As the Fifth Circuit succinctly says in *Pilgrim Equipment*, "the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." 527 F.2d at 1312. *Also see Snell,* 875 F.2d at 808 ("Under circumstances involving considerably more latitude and less supervision than that demonstrated in the case before us, the Supreme Court determined that homeworkers can be employees within the FLSA, stating: '[The workers] are regimented under one organization, manufacturing what the organization desires and receiving the compensation the organization dictates.'"), *quoting Goldberg v. Whitaker House Cooperative,* 366 U.S. 28, 32, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961). Also see *Superior Care,* 840 F.2d at 1060 ("An employer does not need to look over his workers' shoulders every day in order to exercise control."). The opinion in *Baker v. Barnard Construction* does a good job illustrating *why* lack of supervision over minor regular tasks is not indicative of independence: "One would not say

that a secretary has independence consistent with independent contractor status simply because his supervisor does not tell him how to type." 860 F. Supp. 766, 771 (D.N.M. 1994) *aff'd sub nom. Baker v. Flint Eng'g & Const. Co.,* 137 F.3d 1436 (10th Cir. 1998). Consistent with this, Patterson did not always literally stand over workers acknowledged by Patterson to be employees either. *Ex. 27. Depo. of Walther at* 163:11-13.

Patterson inspected the welds (either themselves or by hiring a third party inspector) and asked the welders to redo their welds if there were mistakes or Patterson wanted something different. *Ex. 19. Depo. of Smith at* 124:1-11 ("Come by several times and looked at the welds, said you need to add more or maybe next time don't put that much."). Patterson was building the rigs for its *own* use, not for a customer's. *Ex. 24. Depo. of Hall at* 64:12-17. *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 332-33 (5th Cir. 1993) ("Sunland had no control over the manner or method of the pipe welding. Instead, *Sunland's customers* dictated the specific welding procedures and the type of welding rods required for each construction project. Before each project, *the gas company customer, not Sunland*, tested and certified each Welder. Sunland was prohibited from participating in the test's administration.") (Emphasis added).

Although Melvin Hall, Manager of Rig Construction at the Tyler yard, testified that he did not recall verbally disciplining any of the welders, *Ex. 24. Depo. of Hall at 46:15-20*, plaintiff testimony provides strong evidence that he did verbally discipline the welders. *See, e.g., Ex. 2. Depo. of Faulkner at 92:10-95:1* (Testifying that Melvin Hall would frequently verbally discipline welders and that, when he did, "just about every word was a cuss word."); *id. at* 56:8-17. In fact, many Patterson supervisors, including Melvin Hall, regularly verbally disciplined or yelled at the welders and otherwise created a culture of intimidation and fear. *Ex. 3. Depo. of*

*Feistal at* 128:22-24 (Testifying that Patterson would verbally discipline him if he took too long on a project); *id. at* 146:4-148:8.[14]

Byron Walther, who was the field manager in Victoria, corroborates the other testimony regarding control.

> **Q.** Did you treat the welders out there that were working in the yard, was it kind of like when you were a welder [classified as an employee] and you would be told by someone what to weld?
> **A.** I treated the welders that was in the yard, electricians in the yard and rig crews in the yard all the same.
> **Q.** So the electricians, the rig crews, they were all treated the same?
> **A.** Yes.
> **Q.** Okay. And as far as the welders go, you would tell them what to weld?
> **A.** Yes.
> **Q.** And you would give them instructions, detailed instructions on how Patterson wanted it?
> **A.** Yes.
> **Q.** And they were expected to weld it the way Patterson wanted it?
> **A.** We were expected to keep all our equipment built the same.

*Ex. 27. Depo. of Walther at* 49:20 – 50:14. Indeed, the rest of his testimony *confirms* that he treated the welders the same as other Patterson employees. He required all workers (including welders) to work seven to five, and he sometimes required them to stay late. *See id. at* 51:7 – 52:6. Sometimes, but not always, he would let welders know ahead of time if they would be required to work late. *See id. at* 60:14-25. Although he solicited advice from the welding leads, he retained the ultimate responsibility for hiring or firing welders. *See id. at* 54:8-12. He fired welders for "poor work" and sometimes, albeit "very seldom," for being late without an excuse. *See id. at* 56:22 – 57:20. He required welders to sign in on the same sign-in sheet as everyone else, attend the same safety meetings as everyone else, take two fifteen minute breaks at nine and three, take a lunch break at twelve, and, sometimes, albeit "very seldom," work through lunch.

---

[14] *Ex. 3. Depo. of Feistal at* 43:7-21; *Ex. 17. Depo. of Rivas at* 125:15-25, 137:11-22; *Ex. 21. Depo. of Umphries at* 69:7-9, 90:21-25, 92:10-20; *Ex. 22. Depo. of Westbrook at* 102:9-14; *Ex. 9 Depo. of B. Martin at* 100:24 – 101:11; *Ex. 10 Depo. of J. Martin at* 66:6-11; *Ex. 11 Depo. of McCall at* 32:7-22, 42:19 – 43:2; *Ex. 13 Depo. of McNulty at* 33:11-16; *Ex. 16 Depo. of Nicholas at* 63:4-23 (Was verbally disciplined for wearing a baseball hat).

*See id. at* 78:9 – 79:5; 77:7 – 78:8; and 59:1-19.  The welders would often be required to work seven days a week and would sometimes be required to work twelve days in a row.  *See id. at* 62:3-12.  The welders were sometimes required to work holidays such as Thanksgiving.  *See id. at* 63:8-10.  The welders were required to call if they could not come in due to illness.  *See id. at* 65:12-18.  Welders were required to go through a "third-party orientation" when they started working, because "everybody went through an orientation." *See id. at* 67:23 – 68:6.  Although they were not generally given an "employee handbook," they were given a "sheet" with a "general breakdown of some safety dos and don'ts in the yard – or dos and don'ts… period." *See id. at* 69:16-22.  Patterson had a zero tolerance drug policy, and it paid for random testing for *all* its workers. *See id. at* 70:21-25 *and* 134:7 – 135:5.  Welders were not allowed to wear jewelry. *See id. at* 71:5 – 72:4.  Byron Walther also testified, "If you were not a leadoff welder, we asked you not to be on your cell phone unless it was a break."  *See id. at* 71:5 – 72:4.  Like all other employees, when it was hot, the welders had to drink a certain amount of water and were not allowed to drink energy drinks.  *See id. at* 73:23 – 74:14 *and* 76:15 – 77:6.  Byron Walther told the welders how he wanted them to fill out their invoices.  *See id. at* 83:5-22.  Finally, rather than having welders work on a particular project until it was finished and then reevaluating their contract, Patterson would often move welders around to multiple projects during a single day. *See id. at* 80:2-6.  By way of contrast, the control Patterson exercised over the plaintiffs in this case was significantly greater than the control Patterson exercised over Byron Walther when *he* was classified as a contract welder by Patterson.  *See id. at* 157:15 – 160:12.

In this case, then, there is more than sufficient evidence to support a finding that the amount of control the defendant exercised over the plaintiffs weighs strongly in favor of a determination of employee status.

ii.     *The defendant completely controlled the plaintiffs' legally relevant opportunities for profit or loss.*

The plaintiffs could not meaningfully control their opportunities for profit or loss, because their hours and rates of pay were unilaterally determined by Patterson.  *Ex. 32. Depo. of Andel at* 106:12-14 ("[T]hey changed the rate [of pay].  Byron [Walther] changed it."); *Ex. 28. Affidavit of Andel at Paragraph* 5 ("Patterson determined how many hours we would work each day, and welders did not have a choice of what hours or days we would work.").  Patterson set plaintiffs' pay rates without negotiation, and the welders who tried to negotiate a higher pay rate were unsuccessful.[15]  *See Cromwell v. Driftwood Elec. Contractors, Inc.,* 348 Fed. App'x 57, 61 (5th Cir.2009) ("[The defendant]'s complete control over [the plaintiffs'] schedule and pay, had the effect of severely limiting any opportunity for profit or loss by [the plaintiffs]. Although it does not appear that [the plaintiffs] were actually prohibited from taking other jobs while working for [the defendant], as a practical matter the work schedule establish by [the defendant] precluded significant extra work.") See also *Barnard Const.,* 860 F. Supp. at 778 ("Plaintiffs' hours are unilaterally controlled by the Defendants. The Court finds this control to be consistent with finding rig welders to be employees. Arguably, *this finding alone* would appear to suggest that the remedial purpose of the FLSA to eliminate long hours would weigh in favor of coverage.") (Emphasis added).  Plaintiffs testified that, because of the long hours they were required to work by the defendant, they were unable to work anywhere else.  *See, e.g., Ex. 33. Depo. of Flukinger at* 136:1-4.  *Also Ex. 19. Depo. of Smith at* 103:22-23 (Testifying that, while

---

[15] *Ex. 1. Depo. of Beam at* 30:18-23, 42:17-43:4, 45:1-7; *Ex. 3. Depo. of Feistel at* 67:14-68:7, 77:5-13; *Ex. 5. Depo. of Guadarrama at* 44:25-45:6; *Ex. 6. Depo. of Hasler at* 33:2-9; *Ex. 7. Depo. of Hiburn at* 27:17-28:8; *Ex. 8. Depo. of House at* 58:19 – 59:17; *Ex. 17. Depo. of Rivas* 28:2-8, 53:10 – 54:7; *Ex. 18. Depo. of Roberts at* 32:6-17; *Ex. 19. Depo. of Smith* 40:9-17; *Ex. 20. Depo. of Thompson at* 18:22 – 19:4; *Ex. 21. Depo. of Umphries at* 28:20 – 29:1-3; *Ex. 22. Depo. of Westbrook at* 102:1-8; *Ex. 2. Depo. of Faulkner at* 28:11-18; *Ex. 10. Depo. of J. Martin at* 81:25-83:19; *Ex. 11. Depo. of McCall at* 28:12-24; 30:4-9; *Ex. 12. Depo. of McKinney at* 39:3-13; *Ex. 13. Depo. of McNulty at* 32:11-18; *Ex. 15. Depo. of Moss at* 23:17-24:2; *Ex. 16. Depo. of Nicholas at* 23:10-23.

Patterson never explicitly forbade him to work somewhere else on his days off, "[H]ow would you?  I mean, you've got to sleep, man.  You've been working 14 days straight.").

Moreover, several welders actually *were* specifically told that they could not work for another employer while working for Patterson.  *See, e.g., Ex. 9. Depo. of B. Martin at* 100:4-15.  (Testifying that Patterson supervisor Melvin Hall told him, "If you were going to work for Patterson-UTI, you were going to work for Patterson-UTI.  And that meant exclusively the yard."); *Ex. 3. Depo. of Feistel at* 42:21-23 ("They specifically told us we weren't allowed to do anything outside of their yard.").

The welders were paid by the hour at a nonnegotiable rate set by Patterson, so they could not control their profits or losses by working faster or slower or by making fewer mistakes.  *See Baker v. Flint Eng'g & Const. Co.,* 137 F.3d 1436, 1444 (10th Cir. 1998).  ("Generally speaking, an independent contractor has the ability to make a profit or sustain a loss due to the ability to bid on projects at a flat rate and to complete projects as [he] sees fit").  S*ee, e.g., Ex. 24. Depo. of Hall at* 164:6-7.  (Testifying that, if a welder wanted to make more money, "[h]e was free to go out the gate and go somewhere else.").  *See also Ex. 33. Depo. of Flukinger at* 31:10-18; *Ex. 34. Depo. of Krogsgaard  at* 104:13-14.  ("Byron would raise and lower our money whenever he – at his discretion or whatever.  He would tell us what we could charge and what we couldn't.").  Furthermore, there is no evidence that the welders meaningfully shared in Patterson's profit or loss. *See Cromwell*, 348 Fed. App'x at 61; *Baker*, 137 F.3d at 1441.[16]

---

[16] Citing *Cromwell*, Judge Rainey writes in an opinion for the Victoria District Court that the "factor related to opportunity for profit or loss weighed in favor of employment status where employees' required schedule of 13 consecutive 12–hour days with one day off "had the effect of severely limiting any opportunity for profit or loss" by "preclud[ing] significant extra work." *Mack v. Talasek*, CIV.A. V-09-53, 2012 WL 1067398 (S.D. Tex. Mar. 28, 2012)  The facts in this case are similar to those in *Cromwell*, in that the welders were required to work overtime and had a mandatory schedule that effectively precluded working elsewhere.

It is possible that the plaintiffs could have quit working at Patterson and found comparable jobs with fewer hours elsewhere. This speculation, however, is completely immaterial, because it is a well-established principle in these kinds of cases that "it is not what the [workers] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive." *Mr. W. Fireworks,* 814 F.2d at 1047. *Also see Snell,* 875 F.2d at 808. If the theoretical ability to quit and get another job were proof of independent contractor status, then all workers would be independent contractors, because anyone can quit and get another job. Clearly, this is not what Congress intended.

Furthermore, according to plaintiffs' testimonies, the rate at which they used up their consumables was largely determined by whatever work Patterson had them doing. *Ex. 34. Depo. of Krogsgaard at* 52:5-7. ("You couldn't go buy any kind of welding rods you wanted; you had to buy a certain kind for certain applications to weld on"). *Also see, e.g., Ex. 34. Depo. of Krogsgaard at* 88:16-22 *and* 165:7-19; *Ex. 19. Depo. of Smith at* 45:23-46:1. ("[T]hey'd tell us… what rods they wanted us to use"). Additionally, being assigned to different jobs at different times effectively eliminated their ability to control costs by "shopping around." For example, suppose a welder bought a more expensive chop saw blade, reasoning that, for a certain kind of cut, the blade would last longer and justify the additional cost. Patterson, though, might then assign him to a job for which a cheaper blade would have worked just as well. The plaintiffs had no way of knowing in advance what kind of job they would be assigned and, thus, no way of "making a profit" by controlling their costs.

Patterson controlled the rate at which all of the plaintiffs' equipment would wear out. For instance, a plaintiff's welding truck might wear out sooner if Patterson required him to drive

frequently to a remote rig location rather than to weld in the yard. This is true irrespective of how much the truck costs, or whether it was used or new.

Additionally, the cost of trucks, welding machines, and tools is arguably irrelevant for the "control of profit or loss" factor. If a welder buys a truck, he has a truck he can sell. The same is true for his welding machines and other tools. Only consumables are used and not recoverable, and, as indicated above, the rate at which these were used was largely determined by Patterson, not by the plaintiffs. Patterson welders did not make any more or less money based on how much equipment they had or how nice their equipment was. *Ex. 24. Depo of Hall at* 47:11-24 (Testifying that all of the welder, aside from the supervisors, go paid the same amount per hour).

Moreover, "shopping around" is not generally the kind of "profit" or "loss" that is indicative of economic independence. [17] *See, e.g., Cromwell,* 348 F. App'x at 61*; Baker*, 137 F.3d at 1441; and *Snell,* 875 F.2d at 809. There is a good reason "shopping around" (or the lack thereof) has not often been considered relevant "profit" or "loss" in these kinds of cases. Any worker—whether an employee or independent contractor—can increase or decrease her net pay by buying cheaper or more expensive tools, equipment, etc. For instance, an IT employee might choose to upgrade her work computer and, thus, "decrease" her net income. But this is not really "profit" or "loss" so much as good (or bad) decision-making. *Baker,* 137 F.3d at 1441 ("Generally speaking, an independent contractor has the ability to make a profit or sustain a loss

---

[17] In *Carrell*, the court does note in passing that the "[w]elders' profits also depended on their ability to control their costs," but it is unclear how much weight, if any, the court gives to this assertion. There is good reason to suspect that the court does not give it much weight. In *Cromwell*, in which the Fifth Circuit analyzes *Carrell*, the "profit or loss" factor in *Carrell* is seen, overall, as weighing in favor of *employee* status. *See Cromwell*, 348 F. App'x at 59. The Tenth Circuit goes even further and says flatly that maximizing profits "by controlling the costs of… welding supplies… is not the type of 'profit' typically associated with an independent contractor." *Baker*, 137 F.3d at 1444.

due to the ability to bid on projects at a flat rate and to complete projects as it sees fit.").  The primary factors that determined plaintiffs profit or loss are their hourly rate and the hours they worked, both of which were set by Patterson.

> iii.  *The defendant's investment in the work dwarfed the plaintiffs' investments, and the plaintiffs' investments are not the most legally relevant kinds of investments for showing economic independence.*

Patterson's main business is drilling oil wells.  As a part of this business Patterson designs, builds, modifies, and refurbishes its own drilling rigs.  *Ex. 25. Depo. of Reimers at* 10:16-11:4; *Ex. 24. Depo. of Hall at* 64:12-23.  The welders working for Patterson worked solely on Patterson drilling rigs.  *Id*.  Even if you discount all of Patterson's other costs associated with drilling wells and focus only on the money spent by Patterson to build and refurbish its rigs in the Victoria and Tyler Yards, the plaintiffs' investments in their own tools, equipment, and consumables, is dwarfed by the money spent by Patterson.  The plaintiffs individually spent roughly $40,000 to $150,000 supplying their welding equipment, trucks, and consumables. Patterson, however, supplied the capital goods, as well as "the equipment to modify the rigs, i.e. iron, tanks, generators, motors, pumps, etc.  Patterson would [also] provide the cranes, fork-lifts, pole trucks, the shop and yard, and would let [welders] use their wire machine welders for large jobs." *Ex. 28. Affidavit of Andel.*  In fact, Jerry Krogsgaard worked in Patterson's shop and used their welding machine for months at a time. *Ex. 34. Depo of Krogsgaard at 65:8-13 and 89:22 – 90:1.*

In providing all of this, the defendant spent well over 350 million dollars in the Victoria Yard alone.  *Ex. 25. Depo. of Reimers at* 14:17-22, 17:10-22, 21:15-23, *and* 23:12-16 (Testifying that each new rig cost around $18 million; that $360 million was a reasonable estimate of the amount of money Patterson had invested in new rigs that came through just the Victoria yard;

that it costs between one and one-half to six million dollars to refurbish a rig; and that Patterson had spent roughly $5 million preparing the Victoria yard for work)[18].  Patterson also occasionally provided the welders welding rods or equipment.  *Ex. 8. Depo. of House at* 61:14-17 (Testifying that Patterson often let him use their mag drill).[19]

When considering *relative* investment, the pertinent consideration is exactly that: *relative*.  It is not enough to look at one party's investment and draw a conclusion.  *See, e.g., Mr. W Fireworks,* 814 F.2d at 1052*; Pilgrim Equipment,* 527 F.2d at 1314. *Also see Baker,* 137 F.3d at 1442.   ("The district court is clearly correct in finding plaintiffs' investments in their welding rigs are significant…  However, plaintiffs' investments are disproportionately small when compared to [the defendant]'s investment in the overall business. Several witnesses testified that [the defendant] routinely had hundreds of thousands of dollars of equipment at each work site. *Compared to [defendant]'s investment in the overall business,* plaintiffs' investments are not so significant as to indicate they are independent contractors."  (Emphasis added).

The reasoning behind making the investment factor relative is simple: in a situation in which one is in business for oneself (i.e. in which one is an economically *independent* entity), it axiomatic that the majority of necessary expenses are one's own.  By contrast, it is clear in this case that the plaintiffs could not have done the work that they were doing for the defendant without the defendant's substantially greater investment.  In other words, the only independent business entity in this case was Patterson.

---

[18] Although Mike Reimers primarily oversaw the Victoria Yard, testimony by Tommy Spurlock shows that the amount Patterson spent in the Tyler Yard was similar.  *Ex. 26. Depo. of Tommy Spurlock at* 52:7-20 (Testifying that Patterson spent 18 to 23 million on new rigs and that there were 15 to 20 new builds constructed in Tyler while he was there, which means that Patterson spent anywhere from 270 to 460 million dollars in the Tyler Yard *on rigs alone*)

[19] *See also Ex. 3. Depo. of Feistel at* 20:23-21:12;  *Ex. 7. Depo. of Hilburn at* 73:13-74;  *Ex. 19. Depo. of Smith at* 79:5-10;  *Ex. 21. Depo. of Umphries at* 70:4-6;  *Ex. 22. Depo. of Westbrook at* 23:2-3; 23:23-25.

Furthermore, the investment of the welders (i.e. equipment and consumables) is *not* the most significant kind of investment in determining relative investment. This is the kind of case in which, "courts have generally held that the fact that a worker supplies his or her own tools or equipment does not preclude a finding of employee status." *Snell*, 875 F.2d at 810.[20]

The Fifth Circuit and the Supreme Court have also found it significant whether the "premises" or the "space" in which the work is done belong to the alleged employee or to the alleged employer. *See, e.g. Albert Enterprises*, 508 F.2d at 300, *citing McComb*, 331 U.S. at 730. *Also see, e.g., Brennan v. Partida,* 492 F.2d 707, 710 (5th Cir. 1974).[21] These principles makes sense in light of the overarching "economic dependence or independence" question. After all, one would expect an economically independent entity to have invested enough in the facilities to "be in *business* for himself," not merely to have invested in the tools of the trade necessary to do a job for another company. *See, e.g., Albert Enterprises,* 508 F.2d at 302. For these reasons— that the investment of the defendant greatly outstrips the investment of the plaintiffs and that the plaintiffs did not invest in anything outside of the equipment and consumables necessary to do jobs for other companies—the relative investment factor weighs in favor of a finding of employee status.

---

[20] *Dole v. Snell* continues with a string citation, including cases from the Fifth Circuit and the Supreme Court: "*See Rutherford Food Corp. v. McComb,* 331 U.S. at 725, 67 S.Ct. at 1474 (meat boners own their own hooks, knives, and leather belts (aprons) and were still found to be employees); *McLaughlin v. Seafood, Inc.,*861 F.2d at 451 (seafood processors supply their own hairnets, aprons, gloves and seafood knives); *Sec'y of Labor v. Lauritzen,* 835 F.2d at 1537 (pickle pickers provide their own gloves); *Robicheaux v. Radcliff Material, Inc.,* 697 F.2d at 666 ("Although each of the welders had invested his own money in purchasing a welding machine, the district court concluded that a relatively minor portion of the compensation was paid to the employees based upon their furnishing the equipment and that the major part of the compensation was paid for the services of these ... employees."); *Real v. Driscoll Strawberry Associates, Inc.,*603 F.2d at 752 (migrant farmworkers furnish their own hoes, shovels, pruning clippers and hand carts); *Donovan v. Tehco, Inc.,* 642 F.2d 141, 143 (5th Cir.1981) (worker supplies hand tools); *Schultz v. Mistletoe Express Service, Inc.,* 434 F.2d at 1270-71 (terminal operators furnish local trucks); *Silent Woman, Ltd. v. Donovan,* 585 F.Supp. at 451(Seamstresses who work at home and supply their own sewing machines are considered employees. 'The only 'expenditure' for which the ... seamstresses obtain a return is their own labor.')."

[21] In this case, it is clear that the premises or space (i.e. the welding yards) being used belonged to Patterson.

iv.     *The plaintiffs rarely, if ever, used specialized skills in their work with the defendant and certainly not in a way that indicates independence.  They were not able to exercise initiative indicative of independence.*

Plaintiffs rarely, if ever, used specialized skills at Patterson and certainly not in any independent fashion.  This fact weighs in favor of a finding of employee status.  *See Cromwell,* 348 F. App'x at 60 (Noting the fact that the welding in *Robicheaux* required only "moderate" skill as evidence that the welders were employees).  Neither of the two major Fifth Circuit FLSA overtime cases involving rig welders consider rig welding *itself* a specialized skill. *Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662, 666 (5th Cir. 1983); *Carrell v. Sunland Const., Inc.,* 998 F.2d 330, 333 (5th Cir. 1993). *Robicheaux* states that "[t]he skill required for welding [is] 'moderate.'" *Robicheaux,* 697 F.2d at 666.  *Carrell* stresses that "[p]ipe welding, *unlike other types of welding*, requires specialized skills" *Carrell,* 998 F.2d at 333 (Emphasis added).  *See also Martin v. Selker Bros., Inc.,* 949 F.2d 1286, 1295 (3d Cir. 1991). ("[T]he use of special skills is not itself indicative of independent contractor status, especially if the workers do not use those skills in any independent way.") The welders at Patterson rarely, if ever, used any specialized welding skills in their work for Patterson.  *Ex. 32. Depo. of Andel at* 57:19-22 (Noting that the work at Patterson required less skill than the work at the company where he is now employed and is paid overtime); *See also Ex. 14. Depo. of Morris* at 43:7-11 (Testifying that he did not use his TIG certification at Patterson and that the welding there was just stick rod welding, one of the most basic kinds of welding.)*; Ex. 18. Depo. of Roberts at 32:22*-24 (Testifying that "Patterson is not a pipeline company" and that welding on drilling rigs is "not much more than working on a tractor in your field."); *Ex. 24. Depo. of Hall at* 32:2-3 (Testifying that welders did not have to take a welding test in order to work at Patterson).

In these kinds of cases, the important consideration is whether workers regularly used specialized skills in the work that they were doing—not whether they had specialized skills that they could use. *See e.g., Carrell*, 998 F.2d at 333. (Finding the fact that welders *only* did a specialized kind of welding to weigh in favor of independent contractor status but noting that other types of welding were not specialized). In this case, Patterson often assigned welders to less skilled non-welding tasks.[22] One plaintiff testified, "I used a mag drill. I would use it four or five days, and then I'd go do something else, drilling holes. And then I'd do something else, and then sometimes I would come back and do it again." *Ex. 8 Depo. of House at* 35:5-22. Regardless, most of the welders testified that they did not have many specialized skills or that they were only decent, average, or moderately skilled welders.[23]

Furthermore, the plaintiffs did not move from company to company and job to job but instead relied on Patterson exclusively for long periods of time.[24] Patterson automatically moved the welders to new jobs as old jobs were completed and required no initiative on the part of the

---

[22] *See also Ex. 2. Depo. of Faulkner at* 27:5-16, 43:1-6; *Ex. 5 Depo. of Guadarrama at* 28:13 – 28:18, 122:21 – 124:1; *Ex. 1 Depo. of Beam at* 68:3-13; *Ex. 15 Depo. of Moss at* 30:8 – 31:3.

[23] *See, e.g., Ex. 1. Depo. of Beam at* 27:9-11; *Ex. 3. Depo. of Feistel at* 30:10-24; *Ex. 5. Depo. of Guadarrama at* 33:18-34:7; *Ex. 6. Depo. of Hasler at* 16:17-22; *Ex. 7. Depo. of Hilburn at* 22:24-23:19; *Ex. 8. Depo. of House at* 20:16-21; *Ex. 17. Depo. of Rivas at* 11:9-12, 12:8 – 13:5 (Only ever did structural welding), 40:19-20; *Ex. 18. Depo. of Roberts at* 11:11-13, 33:10-11; *Ex. 20. Depo. of Thompson at* 11:7-10; *Ex. 22. Depo. of Westbrook at* 65:18-24, 70:11-16 (Has been fired off a job for poor welding); *Ex. 23. Depo. of Wood at* 49:24 – 50:1; 52:1-2; *Ex. 2. Depo. of Faulkner at* 28:2-7; *Ex. 9. Depo. of B. Martin at* 143:11-20; *Ex. 10. Depo. of J. Martin at* 63:1-11; *Ex. 15. Depo. of Moss at* 19:7-8; *Ex. 16. Depo. of Nicholas at* 19:18-20:2. *Ex. 2. Depo. of Faulkner at* 87:7-12; *Ex. 3. Depo. of Feistel at* 53:17-25; *Ex. 18. Depo. of Roberts at* 47:3-4; *Ex. 22. Depo. of Westbrook at* 182:7-10; *Ex. 16. Depo. of Nicholas at* 84:23-25.

[24] *Ex. 2. Depo. of Faulkner at* 87:19-88:2; *Ex. 3. Depo. of Feistel at* 42:10-23, 145:10-18, 154:17-155:3 (Was worried he would be fired if he worked for someone else); *Ex. 4. Depo. of Gonzalez at* 17:17-18:24, 60:19-21, 61:22-62:8; *Ex. 6. Depo. of Hasler at* 87:15-23, 97:4-8; *Ex. 7. Depo. of Hilburn at* 40:19-41:15; *Ex. 8. Depo. of House at* 94:21-24; *Ex. 17. Depo. of Rivas at* 41:4-10; Ex. 17. *Depo. of Rivas at* 41:21 – 42:3; *Ex. 18. Depo. of Roberts at* 47:3-4; *Ex. 18. Depo. of Roberts at* 86:15-25, 87:8-23 (Thought he was laid off in part because he asked for a break); *Ex. 19. Depo. of Smith at* 103:9-23; *Ex. 20. Depo. of Thompson at* 53:21-23, 54:15-22 (Was unsure if he could come back to Patterson after he left); *Ex. 21. Depo. of Umphries at* 94:3-6; *Ex. 22. Depo. of Westbrook at* 173:3-12 (Was worried he would be fired if he worked for someone else); *Ex. 23. Depo. of Wood at* 59:20-22; 60:13-15 (Testifies that Patterson did not want them to work for other people.); *Ex. 1. Depo. of Bean at* 46:2-16, 93:8-94:4; *Ex. 2. Depo. of Faulkner at* 87:19-88:2; *Ex. 9. Depo. of B. Martin at* 100:4-15; *Ex. 11. Depo. of McCall at* 53:19-54:12; *Ex. 12. Depo. of McKinney at* 62:7-16; *Ex. 14. Depo. of Morris at* 34:9-16. Many of the welders did not like to jump around from job to job. *See, e.g., Ex. 2. Depo. of Faulkner at* 59:17-22 ("I tried to stay steady, you know. I don't like to jump around."); *Ex. 3. Depo. of Feistel at* 75:2-10, 76:5-7; *Ex. 14. Depo. of Morris at* 65:10-20.

welders to keep their jobs.  Furthermore, the majority of the plaintiffs testified that they did not own a business at all while working for Patterson.[25]  Those that did own a business did not operate as a business while they worked for Patterson. *See, e.g., Ex. 3. Depo. of Feistel at 154:10-16* (Testifying that he was not allowed to work for other people while he was working for Patterson).  These facts establish that the plaintiffs did not exhibit the initiative typically displayed by independent welders. *Carrell,* 998 F.2d at 333 ("As for the initiative required, a Welder's success depended on his ability to find consistent work by moving from job to job and from company to company.").

     v.     *The duration of time the plaintiffs worked for the defendant weighs heavily in favor of a finding of economic dependence.*

The plaintiffs worked exclusively for Patterson for long periods of time. The following is a summary of the length of time each Plaintiff worked:

1)     Pete Rivas worked for Patterson for about 10 years. *See Ex. 17. Depo. of Rivas at 41:21-23.*

2)     Jeff Faulkner worked for Patterson for approximately 6 years. *See Ex. 2. Depo. of Faulkner at* 16:14-21.

3)     Johnny McKinney worked there approximately 4 years with one break in the Summer of 2007. *See Ex. 12. Depo. of McKinney at* 24:1-22; 25:4-7.

4)     Kenneth Beam worked there approximately 3 years. *See Ex. 1. Depo. of Beam at* 28:22-25, 102:20-24.

5)     C.R. House worked for Patterson for approximately three years. *See Ex. 8. Depo. of House at 34:9-18.*

6)     Robert Moss worked there for approximately 3 years. *See Ex. 15. Depo. of Moss at 26:2-5 and 28:6-11.*

7)     Jeremy Umphries worked there for about 3 years. *See Ex. 21. Depo. of Umphries at 32:3-5.*

---

[25] *See, e.g., Ex. 4. Depo. of Gonzalez at* 22:2-3; *Ex. 8. Depo. of House at* 16:10-12; 17:19-23; *Ex. 23. Depo. of Wood at* 49:10-17 ; *Ex. 1. Depo. of Bean at* 39:20-40:2; *Ex. 2. Depo. of Faulkner at* 23:7-13; *Ex. 7. Depo. of Hilburn at* 26:18-22; *Ex. 17. Depo. of Rivas at* 37:1-20, 39:1 – 40:1; *Ex. 18. Depo. of Roberts at* 32:3-5; *Ex. 20. Depo. of Thompson at* 18:11-15; 25:20 – 26:13 (his welding truck was his personal truck); *Ex. 9. Depo. of B. Martin at* 57:7-15; *Ex. 10. Depo. of J. Martin at* 33:18-34:3; *Ex. 14. Depo. of Morris at* 28:6-9.

8) Alejandro Gonzalez worked for Patterson approximately 2 years then took a break and came back in April 2010 until August 2, 2010. *See Ex. 4. Depo. of Gonzalez at* 12:3-13 and 15:25 to 16:8.

9) Carl Hilburn worked for Patterson for approximately two years. *See Ex. 7. Depo. of Hilburn at* 17:25 to 18:10.

10) Roy Westbrook worked for Patterson almost 2 years the second time he worked there. *See Ex. 22. Depo. of Westbrook at 80:2-20 and 104:4-16.*

11) Brandon Martin worked there for approximately a little over two years. *See Ex. 9. Depo. of B. Martin at 42:10-17 and 74:25 to 75:3.*

12) Stewart Feistel started work sometime in 2009 until the day the closed the yard (approximately two years). *See Ex. 3. Depo. of James S. Feistel at* 48:12-15; 74:21-23.

13) Logan Thompson worked there all together approximately two years; he worked 4 or 5 months was laid off three months, then came back. *See Ex. 20. Depo. of Logan Thompson at 13:4-24 and 20:14-17.*

14) James Chad Martin first went to Patterson in 2005, left and went to Scan Drilling and back twice. *See Ex. 10. Depo. of J. Martin at 29:23-30:13; 35:5-7;* The last time he worked for Patterson it was for about 2 years. *Id at .41:13-19.*

15) Carlos Guadarrama worked for Patterson over a two year period, was laid off and would go back when they were re-hiring.  Ex 5 Depo of Guadarrama 24:22-25:11, 51:10-12, 106:2-6. According to Mr. Guadarrama's invoices he worked for Patterson for over a year was laid off in January of 2010, was rehire in March of 2011, worked for a little more than 6 months and was laid off again.  Ex 36 Guadarrama Invoices.

16) Bart Nicholas started around February 2010, worked about a year, took off about five months, then went back for five months, then left again permanently. *See Ex. 16. Depo. of Nicholas at 26:21 to 27:2.*

17) Andrew McNulty worked for Patterson for approximately 1 year. *See Ex. 13. Depo. of McNulty at 20:1-22.*

18) Larry Wood started working for Patterson in December of 2009 and left in January 2011 because he was laid off. *See Ex. 23. Depo. of Larry Wood at 52:11-20;*  Ex.37 Wood Invoices.  He worked for Patterson for about 1 year. *Id.*

19) Marvin "Billy" McCall was in the Tyler yard for a few months beginning in December 2009, then went to Odessa for over a year, then went back to Tyler, have invoices up to October 2010 *See Ex. 11. Depo. of Marvin "Billy" McCall at 23:24 to 24:19.*  Mr. McCalls invoices indicate he worked in Tyler till the end of November 20012. Ex 38 McCall Invoices. We do not have the Odessa yard

invoices so it is difficult to be certain, but it appears Mr. McCall worked for Patterson for approximately 1 year.

20) Ricky Morris worked at Patterson for approximately 9 months. *See Ex. 14. Depo. of Morris at 17:20 to 19:12.*

21) James Brian Smith worked there about seven months. *See Ex. 19. Depo. of Smith at 42:7-10.*

22) Keith Roberts worked at Patterson for about six months then left, came back and worked two months. *See Ex. 18. Depo. of Roberts at 21:19-21 to 23:7.*

23) Mike Hasler worked there between five and six months. *See Ex. 6. Depo. of Mike Hasler at* 33:19-21.

Of the 23 welders listed above, approximately 19 worked continuously for Patterson for more than a year; approximately 14 had stents that were around 2 years; approximately 7 worked for Patterson for 3 years or more; and the longest tenure was about a decade. *Supra.* The importance of this fact cannot easily be overstated. The Fifth Circuit cites the lengths of time welders were working for the defendants as the *primary* dispositive difference between *Robicheaux* (in which welders were held to be employees of the defendant) and *Carrell* (in which welders were held to be independent contractors). *See Cromwell,* 348 F. App'x at 59-60 ("The *most significant* difference between the facts in [*Robicheaux* and *Carrell*], in terms of the economic reality of whether the plaintiffs were economically dependent upon the alleged employer, was that the *Robicheaux* welders worked on a steady and reliable basis over a substantial period of time exclusively with the defendant, ranging from ten months to three years, whereas the *Carrell* welders had a project-by-project, on-again-off-again relationship with the defendant, with the average number of weeks that each welder worked for the defendant each year being relatively low, ranging from three to sixteen weeks.") (Emphasis added).

Far from hiring welders on a "project-by-project, on-again-off-again" basis, Byron Walther testified that, when lay-offs were necessary, he retained people based primarily on "seniority," meaning that those who had been there the longest were the most likely to be

retained.  *Ex. 27. Depo. of Walther at* 53:2-23.  Melvin Hall testified that at least a couple of welders worked for Patterson continuously from 2003 to 2010, when the Tyler yard closed, and that several welders worked with Patterson continuously for at least a year or two.  *Ex. 24. Depo. of Hall at* 22:20-23:1.  Furthermore, Patterson hired welders to work hourly and automatically moved them to new jobs within the company as they finished their previous jobs.  *Ex. 24. Depo. of Hall at* 117:8-11.  In fact, Patterson would often have welders work on multiple rigs in a single day. *Ex. 16. Depo. of Nicholas at 70:4-11.* The welders worked exclusively for Patterson during the period of time they worked for Patterson.[26]  The facts in this case as they relate to the "permanency" factor, then, are far closer to *Robicheaux* than to *Carrell* and, therefore, support a finding that this factor weighs strongly in favor of economic dependence and employee status.

In *Cromwell*, too, the Fifth Circuit puts significant weight on the permanency factor, even though the plaintiffs in *Cromwell* were temporary workers who only "worked exclusively for the defendants for approximately eleven months."  In finding that these workers were employees and not independent contractors, the court notes, "The plaintiffs in this case did not have the same temporary, project-by-project, on-again-off-again relationship with their purported employers as the plaintiffs in *Carrell* did with their purported employer."  *Cromwell,* 348 F. App'x at 60.  This is especially striking because the court notes that—in many, if not most, other ways—the workers in *Cromwell* resembled independent contractors.  They resembled independent contractors much more than the plaintiffs in the case currently before the court.[27]

     vi.     *The plaintiff's work was an integrated part of the defendant's business.*

---

[26] *See footnote 23, above.*

[27] *See Cromwell,* 348 F. App'x at 61 ("Although there are facts that clearly weigh in favor of independent contractor status, notably that Cromwell and Bankston controlled the details of how they performed their work, were not closely supervised, invested a relatively substantial amount in their trucks, equipment, and tools, and used a high level of skill in performing their work, these facts are not sufficient to establish, as a matter of economic reality, that Cromwell and Bankston were in business for themselves during the relevant time period.")

Welding was an integrated and essential part of Patterson's business. *Ex. 27. Depo. of Walther at* 130:11-14; Ex. 26. Depo. of Spurlock *at* 52:21-25. Patterson was not just contracting with welders for various jobs as the need arose for a welder. Rather, it was hiring men to do primarily welding year after year in a welding yard that it owned. Welding was the *main thing* going on there. This is significant because "workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer" *Donovan v. DialAmerica Mktg., Inc.,* 757 F.2d 1376, 1385 (3d Cir. 1985).

Furthermore, because welding was an integrated, essential part of the defendant's business, Patterson was the type of employer (with respect to welding) intended to be covered by the FLSA's remedial mandate "to spread employment by placing financial pressure on the employer to hire additional workers rather than employ the same number of workers for longer hours." *Brown Equip. & Serv. Tools,* 666 F.2d at 152.

### D. Under the established interpretation of "economic dependence" generally used by the courts, it is manifest that the plaintiffs were employees of the defendant.

When looking at the question of overall economic dependence, it is important to clarify exactly what "economic dependence" means in this context. It clearly does *not* mean that workers would have no possible source of income were it not for the alleged employer. *See Mr. W Fireworks,* 814 F.2d at 1054 ("Economic dependence is *not* conditioned on reliance on an alleged employer for one's primary source of income, for the necessities of life.").[28] Rather, "the question is whether plaintiffs are economically dependent upon [the defendant] during the time

---

[28] Also see *Halferty v. Pulse Drug Co., Inc.,* 821 F.2d 261, 268 *opinion modified on reh'g,* 826 F.2d 2 (5th Cir. 1987): "Thus, it is not dependence in the sense that one could not survive without the income from the job that we examine, but dependence for continued employment. Under [the defendant's] interpretation, wealthy persons could never be employees under the FLSA, and employers could avoid liability to workers simply by paying them so low a wage that the workers are forced to live on other sources of income. We decline to adopt such a view."

period they work for [the defendant]," *Baker,* 137 F.3d at 1443, *citing Pulse Drug,* 821 F.2d at 267.[29] Under this understanding of economic dependence, it is manifest that as a matter of law under the broad scope of the FLSA the plaintiffs in this case were employees of the defendant.

### E. The fact that a representative of the defendant said that the plaintiffs were employees weighs in favor of a finding of employee status

Subjective opinion about independent contractor status and contractual labels are relevant but not dispositive. *Mr. W Fireworks,* 814 F.2d at 1049. *See also, Robicheux,* 697 F.2d at 667. ("The fact that [rig welders] provided their own insurance coverage, listed themselves as self-employed on their tax returns, and had their own business cards and letterheads, does not tip the balance in favor of independent contractor status where… the economic realities of the situation indicate that the employee depended upon the employer for his livelihood, as tested by the cited criteria.") Subjective factors are especially weak evidence for contractor status when the label "independent contractor" is primarily beneficial to the alleged employer. *See Superior Care,* 840 F.2d at 1059*, citing Halferty v. Pulse Drug Co., Inc.,* 821 F.2d 261, 268 n. 5 (5th Cir.), *modified on other grounds on rehearing,* 826 F.2d 2 (1987). ("Though an employer's self-serving label of workers as independent contractors is not controlling… an employer's admission that his workers are employees covered by the FLSA is highly probative.") (Internal citations removed).

In other words, it does not ultimately matter for the defendant whether the welders thought of themselves as contractors, filed 1099s, or had d/b/a names. What counts for the purposes of the FLSA is whether, as a matter of economic reality, the welders can reasonably be

---

[29] The opinion in *Baker* goes on to argue that a "focus on whether plaintiffs rely on [the defendant] for their subsistence… would lead to outcomes clearly at odds with the FLSA. For example, a low-skilled worker who regularly shifts jobs [e.g. … fast food jobs] would never be dependent upon a single employer, or even a single industry, for annual subsistence. The worker would necessarily be classified as an independent contractor for purposes of the FLSA and would not be entitled to overtime pay."

seen as being in business for themselves.  *See, e.g., Pilgrim Equip.,* 527 F.2d at 1315 ("We reject

both the declaration in the lease agreement that the operators are 'independent contractors' and

the uncontradicted testimony that the operators believed they were, in fact, in business for

themselves as controlling FLSA employee status. *Neither contractual recitations nor subjective

intent can mandate the outcome in these cases.* Broader economic realities are determinative.")

(Emphasis added) (Citations omitted).

Subjective factors are not given much weight, because determining employment status

under the FLSA is about the FLSA's remedial intentions, not about common law notions of

"employee" or "independent contractor." *See, e.g., Mednick v. Albert Enterprises, Inc.,* 508 F.2d

297, 302 (5th Cir. 1975). ("It is clear beyond peradventure that the parties' attempt to fasten a

name of 'independent contractor' or 'employment' to their relationship by their own agreement –

or, worse, where one party imposes a name on the other—will avail them little in ascertaining

what the relationship is for purposes of the F.L.S.A.")

Nevertheless, to the extent that it is relevant, subjective opinion weighs in favor of a

finding of employee status in this case.  There is corroborated testimony that people in positions

of authority at Patterson said, "If you draw a check from Patterson, you are a Patterson

employee." *See, e.g., Ex. 35. Depo. of Lawrence at* 10:18-19.  *See also Ex. 3. Depo. of Feistal at*

147:6-10; *Ex. 2. Depo. of Faulkner at* 92:16-24; *Ex. 33. Depo. of Flukinger at* 77:16 – 78:11

(Testifying that Curtis Mann said, "If you draw a check from Patterson-UTI, you work for

Patterson" and that at least one person in authority at Patterson pointed to his patch and said,

"[Y]ou work for me.").

Furthermore, many of the plaintiffs thought—or came to think—of themselves as

employees of Patterson. *See, e.g., Ex. 17. Depo. of Rivas at* 34:2-7.  In fact, virtually all of the

plaintiffs who were asked said that they came to believe they were more like employees than independent contractors during their time at Patterson and that they should have been paid overtime.[30]  Thus, while the law is clear that subjective opinion or contractual labels are not dispositive, on balance, subjective factors cut against a finding of independent contractor status in this case.  Patterson's statements that the welders were Patterson employees and worked for Patterson are highly probative.  *Superior Care*, 840 F.2d at 1059.

### F.  Plaintiffs are entitled to liquidated damages, because the defendant failed to demonstrate good faith and a reasonable attempt to comply with the FLSA overtime requirements

The legal standard governing whether a court ought to grant liquidated damages imposes a substantial burden on the defendant to prove that it acted in good faith. *Stokes*, 424 F. App'x at 326.  The Fifth Circuit writes, "An employer who violates the FLSA is liable for liquidated damages equal to the unpaid overtime compensation unless, *after* concluding that the employer acted in 'good faith' and had 'reasonable grounds' to believe that its actions complied with the FLSA, the district court declines to award liquidated damages (or reduces the amount). 29 U.S.C. § 260." *Stokes*, 424 F. App'x at 326 (Emphasis added).  Importantly, under this standard, the burden of proof of proving good faith falls upon the defendant.  *See, e.g., id.* at 326, *citing Bernard v. IBP, Inc. of Neb.,* 154 F.3d 259, 267 (5th Cir.1998).  ("We have explained that demonstrating good faith and reasonable grounds is a 'substantial burden' borne by the

---

[30] *See, e.g., Ex. 2. Depo. of Faulkner at* 88:15-21; *Ex. 3. Depo. of Feistel at* 80:23-82:22; *Ex. 4. Depo. of Gonzalez at* 20:4-12; *Ex. 6. Depo. of Hasler at* 118:12-119:13; *Ex. 7. Depo. of Hiburn at* 68:5-16; *Ex. 17. Depo. of Rivas at* 34:2-7 (Thought he was an employee); *Ex. 19. Depo. of Smith at* 33:11-12 (It seemed more like an employee-type deal.), 136:23 – 137:4,  138:14-18; *Ex. 21. Depo. of Umphries at* 114:2-18; *Ex. 22. Depo. of Westbrook at* 15:1-2; 180:12-13 (Saying "[t]hey didn't treat us" as independent contractors); *Ex. 1. Depo. of Beam at* 104:22-105:8, 129:3-7, 132:10-17; *Ex. 9. Depo. of B. Martin at* 74:25-75:22; 79:14-80:23; *Ex. 10. Depo. of J. Martin at* 36:10-13; *Ex. 12. Depo. of McKinney at* 101:11-104:13; *Ex. 13. Depo. of McNulty at* 58:11-15, 61:9-16; *Ex. 14. Depo. of Morris at* 28:18-21, 84:22-85:7; *Ex. 15. Depo. of Moss at* 21:4-8, 23:4-9, 68:8-69:11; *Ex. 16. Depo. of Nicholas* 86:16-87:1, 88:7-15.

*employer*.") (Emphasis in original).[31]  See also, *Elwell v. Univ. Hospitals Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002). ("This burden on the employer is substantial and requires 'proof that [the employer's] failure to obey the statute was *both* in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict.' [*McClanahan v. Mathews,* 440 F.2d 320, 322 (6th Cir. 1971)] [internal quotations omitted] [emphasis added]. 'In the absence of such proof [, however,] a district court has no power or discretion to reduce an employer's liability for the equivalent of double unpaid wages.'" *Id.*).

The court should grant liquidated damages, because Patterson has failed to show that it was "in good faith *and* that [it] had reasonable grounds for believing that [its] act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended." 29 U.S.C. s 260 (Emphasis added).  "[G]ood faith requires some duty to investigate potential liability under the FLSA." *Barcellona v. Tiffany English Pub, Inc.,* 597 F.2d 464, 469 (5th Cir. 1979).  *See also Rodriguez v. Farm Stores Grocery, Inc.,* 518 F.3d 1259, 1274 (11th Cir. 2008).  ("[F]or the good faith issue on which liquidated damages turns, the burden is on the employer. Because the burden of proof is placed differently, a finding that willfulness was not present may co-exist peacefully with a finding that good faith was not present.").

It will be impossible for Patterson to meet this substantial burden of proving good faith, because Michael Reimer, the regional manager over the Victoria yard at the time of the events in this suit, admitted that Patterson made no attempt whatsoever to investigate the legality of paying its welders as contractors and then treating them as it did. *Ex. 25. Depo. of Reimers at* 33:9 – 33:12, 35:22 – 36:12, 43:18 – 44:3.

---

[31] *Stokes v. BWXT Pantex* goes into great detail explaining *that* and *why* the test to determine an extended statute of limitations and the test to determine whether the court must grant liquidated damages are different.

## VI.
## CONCLUSION

The plaintiffs are entitled to summary judgment as a matter of law. The plaintiffs have demonstrated that the factors used to determine whether a worker is an employee or independent contractor support a finding that the plaintiffs were employees of the defendant and, further, that the plaintiffs are entitled to liquidated damages. Therefore, plaintiffs respectfully ask this Court to grant their Motion for Summary Judgment.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** plaintiffs pray that this Honorable Court grant plaintiffs' Motion for Summary Judgment and grant any and all further relief that plaintiffs are entitled at law and equity, including liquidated damages.


Respectfully Submitted,


*/s/ William L. Sciba, III*
_____
WILLIAM L. SCIBA, III
State Bar No. 00792824
Federal ID No. 519044
Attorney in Charge
302 West Forrest
Victoria, Texas 77901
(361) 575-0551 Telephone
(361) 575-0986 Facsimile
wsciba@cce-vic.com
ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:
COLE, COLE & EASLEY, P.C.

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing was provided to all counsel of record, via automated Notice of Electronic Filing to Filing Users and/or certified mail and/or facsimile, in accordance with the Federal Rules of Civil Procedure, on this 17th day of December, 2013.

*/s/ William L. Sciba, III*

_____

WILLIAM L. SCIBA, III