## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **JEFF FAULKNER, ET AL.,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Case No. 6:12-cv-104** |
| | § | |
| **PATTERSON-UTI DRILLING** | § | |
| **COMPANY LLC,** | § | |
| **Defendant.** | § | |
| | § | |
| | § | |
| **BRANDON MARTIN, ET AL.** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Case No. 6:12-cv-219** |
| | § | |
| **PATTERSON-UTI DRILLING** | § | |
| **COMPANY LLC,** | § | |
| **Defendant.** | § | |
| | § | |

## ORDER

Before the Court are Plaintiffs' Motions for Partial Summary Judgment (Cause No. 6:12-cv-104, Docket No. 45 and Cause No. 6:12-cv-219, Docket No. 32) and Defendant's Motions for Summary Judgment (Cause No. 6:12-cv-104, Docket No. 44 and Cause No. 6:12-cv-219, Docket No. 31).[1] After considering the briefing and oral arguments, Plaintiffs' Motions in both cases are **GRANTED**. Both of Defendant's Motions are **DENIED**.

## BACKGROUND

Plaintiffs in these cases are welders who performed work for Defendant Patterson-UTI Drilling Company LLC ("Patterson") at its yards in Tyler and Victoria, Texas. Plaintiffs brought

---

[1] The briefing on these Motions, except where it pertained to a specific individual Plaintiff, was substantially similar. Therefore, for convenience and unless otherwise indicated, citation to Docket Numbers in this Order will refer to *Faulkner v. Patterson-UTI Drilling Co., LLC*, Cause No. 6:12-cv-104.

these actions against Patterson asserting that although they typically worked more than 40 hours per week at Patterson, they were not paid time and a half ("overtime"), as required by Section 207(a)(1) of the Fair Labor Standards Act[2] ("FLSA").  Plaintiffs, in their summary judgment motions, claim they were misclassified and paid by Patterson as independent contractors when each was actually an employee as defined by Section 203 of the FLSA.  Plaintiffs also seek liquidated damages pursuant to Section 216(b) of the FLSA.  Defendant Patterson, in its motions for summary judgment, argues Plaintiffs were correctly classified as independent contractors and therefore overtime pay was not required under the FLSA.  Accordingly, the primary issue before the Court is the proper classification of the Plaintiffs under the FLSA.

## APPLICABLE LAW

### A.        Summary Judgment Standard

Summary judgment is appropriate when the record, as a whole, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  A "genuine issue" of material fact exists when a fact requires resolution by the trier of fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  When ruling on a motion for summary judgment, the Court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *Merritt-Campbell, Inc.*, 164 F.3d at 961.

---

[2] 29 U.S.C. §§ 201–219.

**B.**     **FLSA**

"The definition of employee under the FLSA is particularly broad."   *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008).   The test for employee status hinges on "whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself."   *Id.*   Courts typically consider five non-exhaustive factors to determine if a worker is an employee: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship."   *Id.*   No factor is determinative; rather, the totality of the factors must indicate economic dependence of the alleged employee on the employer.   *Id.*

**ANALYSIS**

Based on the parties' briefing and oral arguments, there are no material facts in dispute in these cases.   While the parties offer competing legal interpretations of the facts, the parties agree on the underlying material facts.   Therefore, summary judgment based on the economic realities test is appropriate in this case.   *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 59 (5th Cir. 2009).

**I.**     **Employee Status**

    **A.**     ***The Five-Factor Economic Reality Test***

        **1.**     **Degree of Control**

The degree of control factor favors employee status when the alleged employer exerts significant control over the worker, including setting the schedule of days and hours worked, exercising close supervision, dictating how specific tasks should be done, assigning tasks outside

3

of the worker's area of expertise, requiring workers to wear company uniforms, and being subject to the employer's personnel policies such as drug testing.  *See, e.g.*, *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 846–47 (5th Cir. 2010); *Hathcock v. Acme Truck Lines, Inc.*, 262 F.3d 522, 526 (5th Cir. 2001); *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 332–33 (5th Cir. 1993); *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666 (5th Cir. 1983).  Where the alleged employer exercises less control over the worker, this factor will weigh more heavily in favor of independent contractor status.

The parties agree on the relevant facts concerning Patterson's exercise of control over the Plaintiffs.  Patterson supervisors dictated the Plaintiffs' work schedule, including lunch and break times, the days and hours worked, and the total number of hours worked.  Docket No. 45 at 12–13 (Plaintiffs asserting the degree of control Patterson exerted over the schedule); *E.g.*, Docket No. 44 at 29 (Defendant's chart indicating that Patterson "controlled hours worked"); *see also, e.g.*, Docket No. 53 at 2, 8, 15, 17, 20 (Defendant presenting legal argument concerning scheduling, but offering no evidence to contradict fact that Patterson controlled the Plaintiffs' work schedules).  Plaintiffs were sometimes required to attend safety meetings.  Docket No. 45 at 10 (Plaintiff stating that Plaintiffs were occasionally required to attend safety meetings); *e.g.*, Docket No. 53 at 6, 8, 12, 19 (Defendant arguing the legal significance of drug testing, but never refuting that it occurred).  Many Plaintiffs testified they did not wear Patterson uniforms, while some workers classified as employees were required to do so.  *E.g.*, Docket No. 44 at 5, 15, 20, 24 (Defendant asserting that Plaintiffs were never required to wear uniforms at Patterson).  With little exception, Plaintiffs performed solely welding work while at Patterson and were not assigned other, non-welding tasks.  *E.g.*, Docket No 44 at 15, 18, 26 (Defendant citing depositions of Plaintiffs to show that they provided only welding services to Patterson); Docket

4

No. 55 at 43 (Plaintiff stating it is "[m]ostly true with some exceptions" that Plaintiffs "performed only welding services").   Additionally, Patterson managers provided little direct, daily instruction or supervision of the Plaintiffs.   Docket No. 45 at 15 (Plaintiff stating that supervisors did not tell them how to weld or exercise constant supervision); Docket No. 44 at 27–28 (Defendant citing deposition testimony that welders worked with little supervision from Patterson employees).

The fact that Patterson exercised strong control over the Plaintiffs' work schedules and subjected them to certain personnel policies, such as random drug testing and mandatory safety meetings favors a finding of employee status.   However, the Plaintiffs performed almost exclusively welding work for Patterson, were not required to wear uniforms, and worked under little direct supervision, facts supporting independent contractor status.   Because the undisputed facts here do not substantially favor either classification, this factor is neutral in the economic dependence analysis.

## 2.      Profit and Loss

This factor favors independent contractor status when the alleged employee has significant influence over his opportunity for profit and loss.   Where the worker can control his own costs and has the responsibility of pursuing consistent work, the opportunity for profit and loss is greater.   *Thibault*, 612 F.3d at 848; *Carrell*, 989 F.2d at 333–34.   However, when the alleged employer exerts such significant control over the worker's schedule that doing other paid work is practically impossible, the worker's control over profit and loss is limited.   *Cromwell*, 348 F. App'x at 61.   Similarly, a fixed, nonnegotiable, hourly rate that is not subject to a bidding or proposal process constrains the worker's opportunity for profit and loss.   *Thibault*, 612 F.3d at 848; *Carrell*, 998 F.2d at 333.

Again, the material facts relating to this factor are undisputed.  Patterson set a fixed, nonnegotiable pay rate for welders.  Docket No. 45 at 19 (Plaintiffs arguing that "Patterson set plaintiffs' pay rates without negotiation, and the welders who tried to negotiate a higher pay rate were unsuccessful."); Docket No. 44 at 29 (Defendant's chart indicating that Patterson "decided the fixed hourly rate").  Welders had no opportunity to enter bids or proposals for Patterson welding jobs.  Docket No. 44 at 29 (Defendant's chart indicating that Plaintiffs had "[n]o opportunity to bid on jobs").  The Plaintiffs purchased their own rig trucks, tools, equipment, supplies, and consumables.  Docket No. 45 at 23 (Plaintiff stating that they supplied their own equipment, trucks, and consumables); *e.g.*, Docket No. 53 at 18, 40 (Defendant noting that Plaintiffs chose what brands and types of tools and consumables to buy and where to purchase them).  The only fact relevant to this factor that is not agreed upon is whether Patterson prohibited welders from working elsewhere.  Based on evidence presented by both parties, this probably varied among the Plaintiffs.  *Compare* Docket No. 53 at 2 (Defendant asserting, "Patterson-UTI did not prohibit the welders from working elsewhere, and many did so.") *with* Docket No. 45 at 20 (Plaintiffs arguing that "several welders actually *were* specifically told that they could not work for another employer while working for Patterson.").

Here, the undisputed facts indicate that the Plaintiffs had little control over their profit and loss.  Most significantly, while the Plaintiffs worked at Patterson, the company paid a nonnegotiable, hourly rate and controlled the number of hours welders worked, "severely limiting any opportunity for profit or loss."  *Cromwell*, 348 F. App'x at 61.  Further, regardless of whether any Plaintiff was strictly prohibited from welding elsewhere while working at Patterson, the company's rigid work schedule severely constrained any opportunity to seek or secure other welding jobs.  *Id.*; *see also* Docket No. 45 at 19 ("Plaintiffs testified that, because of

the long hours they were required to work by the defendant, they were unable to work anywhere else."). While Plaintiffs had some degree of control over their costs, for example, choosing what tools and equipment to buy, even this was constrained by the way Patterson assigned specific jobs and tasks. *See, e.g.*, Docket No. 45 at 21–22 (explaining, for example, that Patterson required specific types of consumables for certain tasks and that some assigned tasks used consumables at different rates). The economic reality for the Plaintiffs is that while working at Patterson they had little control over their profit and loss. Accordingly, this factor favors classifying the Plaintiffs as employees.

### 3.     Relative Investment

Under this factor, courts balance the alleged employee's investment against the employer's investment in the specific job at hand. *Thibault*, 612 F.3d at 847 (comparing "the amount the alleged employer and employee each contribute to the specific job the employee undertakes"). Where the employer's investment in the job surpasses the worker's, this factor favors employee status. *Herman v. Express Sixty-Minutes Delivery Service, Inc.*, 161 F.3d 299 (5th Cir. 1998) (finding the plaintiffs' investment in delivery vehicles, insurance, radios, fuel, and delivery supplies insignificant compared to the defendant's investment in office space, office equipment, payroll, and other expenses). However, where the alleged employee's investment in the task is substantial compared to the employer's, this factor favors independent contractor status. *Thibault*, 612 F.3d at 847–48 (finding independent contractor status where plaintiff provided his own bucket truck, safety equipment, tools, temporary housing, and food while defendant provided only a temporary base of operations and the necessary materials).

In these cases, while the parties disagree about the law, neither disputes the facts relating to this component of the economic realities test. Plaintiffs agree with Defendant that each

Plaintiff spent well over $15,000, and up to $150,000, on their trucks, welding equipment, tools, and supplies.  Docket No. 45 at 23 (Plaintiffs asserting that the each Plaintiff "spent roughly $40,000 to $150,000 supplying their welding equipment, trucks, and consumables"); *see also* Docket No. 44 at 28 (Defendant arguing that Plaintiffs supplied their own trucks, tools, and consumables, each spending at least, and often "considerably more" than $15,000).[3]  Plaintiff presents undisputed evidence that Patterson spent $18 million to $23 million to build each new rig and between $1.5 million to $6 million to refurbish a rig.  Docket No. 45 at 24.  Defendants also do not contest that Patterson invested a substantial amount in building and outfitting the yards, including providing cranes, forklifts, pole trucks, and the shop, all of which contributed to the task of building or refurbishing a rig.  *Id.* at 23.  The dispute between the parties on this factor is not the facts, but rather the appropriate comparison for "relative investment."

Under Fifth Circuit precedent, each plaintiff's investment is balanced against the alleged employer's investment in the job at hand.  *Thibault*, 612 F.3d at 847 (comparing "the amount the alleged employer and employee each contribute to the specific job the employee undertakes").  Here, the Plaintiffs' specific job was building and refurbishing Patterson rigs.  Docket No. 45 at 23.  Accordingly, the appropriate comparison balances each Plaintiff's investment in his rig truck, welding equipment, tools, and supplies against Patterson's investment in each rig.  The most any individual Plaintiff spent is $150,000, while the least Patterson spent on any individual rig is $1.5 million.  That amount does not include Patterson's investment in its yard, which also contributed to the specific job of building or refurbishing a rig.  Each Plaintiff's investment in the job pales in comparison to Patterson's investment in each rig.  Accordingly, this factor favors a finding of employee status.

---

[3] While there may be some dispute about the actual amount spent on welding equipment, trucks, supplies, and consumables by each Plaintiff, the exact amounts spent are not material to the proper classification.

### 4.      Skill and Initiative

When weighing this factor, courts consider the initiative needed in both daily tasks and in the long-term success of the worker, as well as the amount of skill required for the actual tasks the worker performs.  When a worker is assigned daily tasks with limited discretion, this factor indicates employee status.  *Cromwell*, 348 F. App'x at 61; *Carrell*, 998 F.2d at 333.  On the other hand, where a worker's success depends on taking the initiative to find consistent work, this factor favors independent contractor status.  *Thibault*, 612 F.3d at 847; *Carrell*, 998 F.2d at 333. Similarly, the more specialized the skills needed by the worker, the more likely the worker is properly considered an independent contractor.  *See Carrell*, 998 F.2d at 333.

As before, the parties do not dispute the material facts pertaining to this factor.  Many of the Plaintiffs were certified welders, some having specialized skills, and some with many years of welding experience.  *E.g.*, Docket No. 44 at 9, 15, 24, 26 (Defendant describing Plaintiffs' welding experience); Docket No. 45 at 26–27 (Plaintiffs describing welding skill required at Patterson without disputing Plaintiffs' skills or certifications).  While working at Patterson, the only initiative required of the Plaintiffs related to completing their assigned welding tasks. Docket No. 55 at 16 (Plaintiff arguing that Plaintiffs demonstrated little initiative because Patterson provided work assignments); Docket No. 53 at 46 (Defendant's chart indicating that Plaintiffs' "[i]nitiative limited to welding work").  However, when work at Patterson was slow, some Plaintiffs did seek other paying work.  *E.g.*, Docket No. 53 at 6, 34 (Defendant describing Plaintiffs who looked for other work during slowdowns at Patterson).

Courts have described general welding as requiring "moderate" skill.  *Robicheaux*, 697 F.2d at 666; *see also Carrell*, 998 F.2d at 333 ("Pipe welding, unlike other types of welding, requires specialized skills.").  While many of the Plaintiffs did hold various, specialized welding

skills or certifications, most asserted—and Defendant does not refute—that they did not use those specialized techniques while working at Patterson.  Docket No. 45 at 26.  Further, it is agreed that while working at Patterson, the Plaintiffs exhibited little initiative.  Upon completion of one assignment, welders were automatically moved to their next task by supervisors.  *Id.* at 27–28.  Conversely, some Plaintiffs demonstrated initiative by finding other work when necessary, especially when the work at Patterson was slow.  *E.g.*, Docket No. 44 at 4, 6, 25. Because the welding work at Patterson was moderately skilled work and the initiative shown by the Plaintiffs was mixed, this factor is neutral in the economic reality analysis.

### 5.      Permanency of the Relationship

This factor considers the length of time the alleged employee worked for the employer, the basis on which the worker is hired, and the exclusivity of the work.  The longer a worker remains exclusively at one company, the more likely the worker is an employee.  *Cromwell*, 348 F. App'x at 61 (holding that splicers who worked exclusively at one company for eleven months were employees); *Carrell*, 998 F.2d at 332 (finding welders who worked from three weeks to sixteen weeks per year and frequently moved between jobs to be independent contractors); *Robicheaux*, 697 F.2d at 666 (classifying welders who worked from ten months to three years almost exclusively for one company as employees).  Additionally, workers hired on a project-by-project basis are much more likely independent contractors than those hired on an ongoing basis. *Compare Thibault*, 612 F.3d at 846 (finding independent contractor status where the plaintiff worked for defendant on a single project), *and Carrell*, 998 F.2d at 332 (finding independent contractor status where the defendant "hired the Welders on a project-by-project basis, but made an effort to move the Welders to subsequent projects") *with Cromwell*, 348 F. App'x at 60

(finding employee status where the plaintiffs did not have a "temporary, project-by-project, on-again-off-again relationship with the purported employers").

The underlying facts relating to this factor are not controverted.  Plaintiffs assert that each Plaintiff worked at Patterson for a long period of time, varying from five months to ten years. Docket No. 45 at 28–29 (listing each Plaintiff and his tenure at Patterson).  Defendant never counters the time periods Plaintiffs describe, but merely points to "gaps," or periods of time where individual Plaintiffs did not invoice Patterson for any work.  *E.g.*, Docket No. 53 at 6, 18, 33–34 (Defendant describing periods when certain Plaintiffs left Patterson, sometimes to provide services to other companies).  Additionally, the evidence indicates Patterson hired welders on an ongoing basis to do whatever was assigned to them, rather than hiring them on a project-by-project basis.  Docket No. 45 at 18 (Plaintiff citing the deposition testimony of a Patterson drilling supervisor indicating that Patterson moved welders from project to project as needed by the company); Docket No. 53 at 46 (Defendant's chart showing that in this case only "some" workers were hired on a "Project-by-Project basis")[4]; *see also* Docket No. 44, Exhibits 20–38, Plaintiffs' Invoices (indicating that Plaintiffs worked on several different rigs for Patterson from week to week); Docket No. 44, Exhibit 51, Depo. of Melvin Hall at 110:7–111:5 (Patterson manager indicating that when field work came up unexpectedly, a supervisor would pick "whoever he wanted" from the yard to go complete the task).

In these cases, the undisputed facts based on the evidence show that this factor favors employee status.  The parties do not dispute that the Plaintiffs worked for Patterson for periods

---

[4] In its brief, Defendant specifically argues that only two individual Plaintiffs worked "project-by-project," James Chad Martin and Pedro "Pete" Rivas. Docket No. 53 at 10, 24.  However, Defendant's only evidence to support that argument is a single quote from Mr. Rivas's deposition.  *Id.* at 24.  In fact, both Mr. Martin's and Mr. Rivas's invoices indicate that they moved between rig projects frequently while at Patterson. *See* Docket No. 44, Exhibit 21, Martin Invoices (showing that Mr. Martin worked on four different rigs in a two-month period); Docket No. 44, Exhibit 28, Rivas Invoices (indicating that in a single month Mr. Rivas worked on four different rigs, including working on multiple rigs in a single day).  Accordingly, this issue presents no genuine issue of material fact.

varying from five months to ten years.  Each Plaintiff's tenure at Patterson was therefore a significant period of time indicating employee status.  *See Robicheaux*, 697 F.2d at 666 (holding that employee status was correctly determined where "the duration of the relationship was from ten months to three years for each [plaintiff] . . . except for insignificant work elsewhere").  Some of the Plaintiffs did leave Patterson intermittently, but only when demand for work at Patterson flagged.  *E.g.*, Docket No. 44 at 4 (Defendant citing deposition testimony that one Plaintiff looked for work elsewhere when work got slow at Patterson); *id.* at 23 ("During a slow down, [one Plaintiff] provided welding services for [another company].  When work was available, [the Plaintiff] provided strictly welding services to Patterson-UTI."); *see also id.* at 16, 17, 19–20, 27.  Further, when the Plaintiffs worked at Patterson, supervisors moved welders from one project to another frequently.  The evidence presented shows that Patterson did not hire welders on a project-by-project basis, but engaged them to provide whatever welding services Patterson needed for as long as Patterson's general demand for welding persisted.  *Compare Cromwell*, 348 F. App'x at 60 (finding employee status where plaintiffs "did not have [a] temporary, project-by-project, on-again-off-again relationship with their purported employers") *with Thibault*, 612 F.3d at 849 (distinguishing *Cromwell* and finding independent contractor status where plaintiff's relationship to defendants "centered solely around the specific project"), *and Carrell*, 998 F.2d at 334 (finding independent contractor status where the plaintiffs relationship with defendant was "on a project-by-project basis").  There are no indications that the Plaintiffs contracted with Patterson for a specific project and then moved on or even renegotiated with Patterson for the next project.  Based on the undisputed facts presented, these welders reported to work at Patterson on a daily basis for extended periods of time and depended on this work their livelihoods.  Therefore, this factor favors employee status.

### 6.      Other Factors

Most of the Plaintiffs here knew they were classified as independent contractors.  *E.g.*, Docket No. 44 at 9, 15, 26.  They received IRS Form 1099s from Patterson and many filed taxes reporting themselves as self-employed and deducting substantial business expenses.  *E.g.*, *id.* at 4, 21, 24, 25; Docket No. 45 at 33–34.  Many of the welders had business cards, letterhead, custom invoices, and used "business" names.  *E.g.*, Docket No. 44 at 4, 15, 16, 20, 25, 27; Docket No. 45 at 33.  However, although subjective opinions and contractual labels are probative, they are not controlling, and in these cases, are only minor indications of independent contractor status.  *Robicheaux*, 697 F.2d at 667 ("[T]he fact that the plaintiff welders in this case signed contracts stating that they were independent contractors, while relevant, is not dispositive. Likewise, the fact that they . . . listed themselves as self-employed on their tax returns, and had their own business cards and letterheads, does not tip the balance in favor of independent contractor status where, as here, the economic realities of the situation indicate that the employee depended upon the employer for his livelihood.").

### B.      *Economic Reality Conclusion*

The undisputed facts here indicate that Patterson misclassified the Plaintiffs as independent contractors, when the economic reality was that they were employees.  Patterson set a fixed, nonnegotiable pay rate for welders.  Company supervisors dictated the schedule, including lunch and break times and the number of hours worked.  Because Patterson controlled the rate of pay and the number of hours worked, Plaintiffs had little control over their profit and loss as welders.  Patterson invested from $1.5 million to $23 million in each rig in addition to building, outfitting, and maintaining the yards.  Comparatively, no welder spent over $150,000 on his truck, tools, and supplies needed to perform the job.  The Plaintiffs worked for Patterson

13

for substantial periods of time, generally exclusively, and were retained based on Patterson's general need for welding work.  They were not hired on a project-by-project basis.  All of these uncontested facts are indicative of economic dependence and employee status.  While it is true that Patterson considered the welders independent contractors, the Plaintiffs provided their own equipment, and the Plaintiffs did almost exclusively welding-related tasks for Patterson, which required moderate skill and little direct supervision, these facts are not enough to overcome the significant factors favoring employee status.  The overall economic reality here is that the Plaintiffs were employees as defined by the FLSA rather than independent contractors.  Further, although there are some facts that differ among the various Plaintiffs in this case, these differences are minor for the purposes of this economic reality test, and in no individual case are they sufficient to alter the overall conclusion.  Because none of the material facts supporting a finding of employee status as to any Plaintiff are disputed here, Plaintiffs' Motions for Partial Summary Judgment are **GRANTED** as to employee status.

## II.    Liquidated Damages

Plaintiffs' Motions for Partial Summary Judgment also included claims for liquidated damages under Section 216 of the FLSA.  Section 216 provides for actual damages of the unpaid overtime and an "additional equal amount as liquidated damages."  Where the employer demonstrates to the court that it acted in good faith and had reasonable grounds to believe its actions complied with the FLSA, the court may, in its discretion, reduce or eliminate liquidated damages.  29 U.S.C. § 260; *Stokes v. BWXT Pantex, L.L.C.*, 424 F. App'x 324, 326 (5th Cir. 2011); *McConnell v. Thomson Newspapers, Inc.*, 802 F. Supp. 1484, 1506 (E.D. Tex. 1992).  If the employer fails to meet this burden, the court is required to award liquidated damages.  *Heidtman v. County of El Paso*, 171 F.3d 1038, 1032 (5th Cir. 1999) (where employers could not

14

show their actions were in good faith and based on reasonable grounds, "it would have been an abuse of discretion if the district court had *not* awarded liquidated damages").

"[G]ood faith requires some duty to investigate potential liability under the FLSA." *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979).  Here, Patterson has offered no evidence that it conducted any investigation into its potential liability under the FLSA.  In fact, Plaintiffs cite the deposition testimony of a Patterson regional manager who stated that Patterson never considered paying overtime wages to welders, Patterson did not investigate the possibility of misclassification of welders under the FLSA, and hiring welders as contractors rather than employers "was just the way it was done."  Docket No. 45, Exhibit 25, Depo. of Michael Reimer at 33:9–12, 35:22–36, 43:18–44:3.  The only argument Patterson offers in response is to reassert that the Plaintiffs were properly classified.  Docket No. 53 at 47.  Because Patterson has provided no evidence that it acted in good faith and based on reasonable grounds, the Court is required to award liquidated damages.  Accordingly, Plaintiffs' Motions for Partial Summary Judgment are **GRANTED** as to liquidated damages.

## CONCLUSION

For the reasons stated herein, the Court **GRANTS** Plaintiffs' Motions for Partial Summary Judgment (Cause No. 6:12-cv-104, Docket No. 45 and Cause No. 6:12-cv-219, Docket No. 32) and **DENIES** Defendant's Motions for Summary Judgment (Cause No. 6:12-cv-104, Docket No. 44 and Cause No. 6:12-cv-219, Docket No. 31).

**So ORDERED and SIGNED this 30th day of January, 2014.**

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**